People of the State of Illinois ex rel. Boleslaus Filipkowski and Catherine Filipkowski, his wife, Appellees, v. George Andrew Gusterine and Mildred Gusterine, his wife, Appellants.

Gen. No. 47,320.

First District, Third Division.
February 19, 1958.
Released for publication March 7, 1958.

Irving Goodman, of Chicago, for respondents-appellants.

Abel J. De Haan and Nathan Shefner, of Chicago, for petitioners-appellees.

JUSTICE FRIEND delivered the opinion of the court.

Petitioners sought by writ of habeas corpus in the Superior Court to regain custody of their minor son whom they had turned over to respondents for the purpose of adoption. Pursuant to hearing, the court found that the consents and appearances executed by petitioners consenting to the adoption were obtained

by constructive fraud, granted the writ, and ordered that the minor child be turned over to petitioners. Respondents appeal, and by means of supersedeas have retained possession of the child.

Petitioners, both Roman Catholics, were married September 11, 1954; two children were born of the marriage, Frank Joseph Filipkowski, on August 22, 1955, and Richard David Filipkowski, the child involved here, on September 4, 1956. In March 1957 petitioners decided to give Richard in adoption. They asked their physician, Dr. Coopersmith, if he knew of any couple who would be interested in adopting their younger son. He referred them to Maurice J. Green, an attorney who has practiced law since 1923. About April 20, 1957, Filipkowski, the child's father and one of the petitioners here, telephoned Green to ask if he knew of a couple who would be interested in adopting their infant son. Green replied that offhand he did not know of any couple, but within a day or two he called to say that a couple, neighbors of his in Skokie, Illinois, were anxious to adopt a baby and had been trying for some time to do so. Green thereupon made arrangements with petitioners for turning over custody of the child to the Gusterines, the respondents here; like the petitioners, they are Catholics. On April 25, 1957 Green, accompanied by the Gusterines, went to petitioners' apartment at 8828 Blackstone avenue in Chicago. He introduced them to petitioners as the couple who were going to adopt their baby.

There is a conflict in the testimony as to what was said. Filipkowski testified that Green told him they would have two weeks to make up their minds. Green denied this; on the contrary, he testified that he asked the Filipkowskis if they were sure they definitely wanted to give up their child, and they replied that they were. In any event, it is undisputed that on that date petitioners voluntarily turned the baby over to respondents for the purpose of adoption. On April 27,

1957 Green telephoned petitioners to tell them that if they wanted to come to the County Welfare Department in the County Court on the following Monday, April 29, 1957, they could be interviewed and sign the necessary consents for adoption. On that day petitioners came to Green's office, and he took both of them to the Welfare Department for an interview in the afternoon. Mrs. Imogene Spencer, a social-service employee in the department, first interviewed Green. After he left to return to his office, Mrs. Spencer interviewed petitioners individually and at length. They admitted upon hearing that she had stressed the irrevocability of their action—that by signing consents they unalterably committed themselves to giving up their child. Mrs. Spencer testified that she underscored to each of the petitioners the finality of their action in signing consents, and she suggested that if they felt unsure about their decision they postpone signing the consents. She told petitioners that "we never wanted to see people give up children for purely financial reasons, because there were other agencies that could help them work out plans on a temporary basis, if they wanted to keep their child . . ." On their part, she said, they replied that they had consulted their priest as well as Mrs. Filipkowski's mother—both of whom had advised against giving the child in adoption; they had concluded, however, that adoption presented the best solution to their problem. Mrs. Spencer said that petitioners were not emotional at the time of the interview. Each petitioner was asked, and answered, a series of questions (set out on a form used by the Welfare Department); one of the questions underlines the irrevocability of the action: "Do you understand that after you sign consent before the Clerk of the Court . . . you relinquish all your rights to the child?" Each of the petitioners answered in the affirmative. Each of the petitioners signed an

338

affidavit stating that he (or she) had read the questions and answers on the Welfare Department form, and affirmed that they were "accurately stated." On trial, when the court asked Mrs. Filipkowski if the desire to give up the child was shared equally by her husband, she answered affirmatively. After the lengthy interviews, petitioners went with Green, who had returned to the Welfare Department from his office, to the Clerk of the County Court, and in his office each of the petitioners signed an appearance and answer; each also signed separate consents entitled "Consent of Father" and "Consent of Mother," which were duly acknowledged before the clerk in accordance with the statute.

It appears that in July 1957, more than two months after the child was turned over to the Gusterines, petitioners decided they wanted the baby back and consulted an attorney. On August 3, 1957 they visited the home of respondents in Skokie, told them they had changed their minds, and asked them to return the child. The Gusterines called their neighbor and attorney, Green; after a discussion, Green and the Gusterines told petitioners that it was not fair for the Filipkowskis to ask for the return of the child, and refused to accede to their request.

Shortly thereafter, on August 7, 1957, the petition for the writ of habeas corpus was filed in the Superior Court. It does not allege that fraud or duress was practiced but, rather, that the "pretended consent was executed by them at a time when they were under great mental strain and tension due to domestic difficulties and illness, so that they were unable to comprehend or understand the nature or effect of their action in surrendering custody of their minor son to respondents . . ." On August 14, 1957 respondents filed their answer in which they alleged, inter alia, that petitioners had executed written consents, duly ac-

339

knowledged in accordance with the statute; that an official of the Cook County Welfare Department had explained to each of them the nature and effect of their consents, together with their finality; that the County Court is the proper place to raise the issues made up by the petition and answer; that under the statute (Ill. Rev. Stat. 1957, ch. 4, sec. 3—7) consents can be set aside only for fraud or duress; that no fraud or duress is alleged in the petition; that petitioners voluntarily gave custody of the child to respondents; and that a full hearing should be had in the County Court where the consents were filed and acknowledged. Petitioners then filed a reply where, for the first time, they charged fraud, apparently on the part of Green, averring that he had told them that they had two weeks within which to make up their minds with reference to giving up the minor child for adoption; that he did not let them see the names of respondents when they signed the consents; and that they signed documents in the County Clerk's office without realizing or understanding their nature. In their rejoinder respondents denied that Green had made any statement that petitioners would have two weeks within which to change their minds; that both Green and the social-service worker explained to petitioners the finality and irrevocability of their action; that no influence of any kind was exerted; that Green did not conceal any documents, or otherwise prevent petitioners from reading the documents signed by them; that petitioners took no action from April 29, 1957 to July 5, 1957, a period extending over two months; that respondents had set in motion an adoption proceeding in the County Court where the rights of the parties to the minor child could and should be determined; that they have become extremely attached to the child and the child to them; and that it would be to the best interests of the child to be adopted by respondents.

340

Section 3—7 of the Adoption Act provides that a consent to adoption, executed and witnessed or acknowledged in accordance with the provisions of section 3—6 of the act, shall be irrevocable, unless it shall have been obtained by fraud or duress, and a court of competent jurisdiction shall so find. Until this amendment was enacted in 1953, consents could be revoked at any time before the County Court had acted upon the petition. In re Thompson v. Burns, 337 Ill. App. 354. As pointed out in the recent opinion of In re Wojtkowiak, 14 Ill.App.2d 344, the amendment of 1953 is to some extent a change of policy in that the legislature has recognized that stability is needed and "that a consent once having been freely and formally given should not be set aside except for fraud or duress. . . . The statute in question is a salutary measure made in the interest of the child, the natural parents and the foster parents. Fraud and duress are the conditions for revocation of consent." Duress is not charged in this proceeding, and the trial court evidently had grave doubts about the existence of fraud; indeed, he observed in his oral opinion given at the close of the hearing that "I would say as far as technical fraud, an express kind of fraud, I would agree we have no single evidence of anything that we'd call fraud in a corrupt way." But he found "constructive fraud," and the order so states.

Petitioners emphasize Green's purported statement —which he categorically denied several times in the course of his examination—that he had told petitioners they would have two weeks to make a final decision with respect to giving their child in adoption. On direct examination Green was asked the following question: "At the time that you were out there [at the Filipkowskis' apartment], did you tell them they'd have a couple of weeks to decide whether or not they're going to keep the baby?" He answered: "Absolutely not. . . . I said, 'The rules governing adop-

341

tion provide that we must apply for permission and consent from the Cook County Department of Public Welfare before we can file a petition for adoption. . . . I will call you. It may take a week or two. I'll call you when you'll come down.' And they said, 'Very well.' " In response to further questioning he continued: "The following day I called them back and I said, 'I discussed the matter with the Department of Public Welfare and with the County Clerk's office and I learned that where a mother and father have a child more than sixty days you do not have to wait any length of time, you can come down immediately after you take the baby. . . . If you wish to wait any time, it's okay with us. If you want to come down sooner,' I said, 'any time at your convenience I'll meet you and take you over to the Department of Public Welfare.' Mr. Filipkowski answered the telephone when I called. He said 'No, we want it done right away. We'll meet you Monday.' I said, 'Fine, come to my office and I'll take you over.' " Both the respondents also categorically denied that Green had represented to the Filipkowskis that they would have a two-week period within which they had a right to the return of the baby. Although petitioners base their case on an alleged two-week grace period, it was over two months after surrendering their child before they made a demand on the Gusterines for his return. They explain their delay by saying that they could not locate respondents any earlier, but this explanation loses much of its force when it is remembered they knew how to contact Green.

This case differs from proceedings that arise occasionally with respect to consents given by unmarried mothers for the adoption of their children. Petitioners here were married and, as heretofore stated, had two children, the younger of whom they decided to give in adoption; their decision was, they testified, the

342

result of two factors: the mother's nervousness and frail health, and their frequent arguments. They had talked the matter over between themselves; they had consulted a priest and Mrs. Filipkowski's mother; Green had explained to them the irrevocability of their action; the social-service worker at the County Welfare Department had explained adoptive procedure in detail, with emphasis on the finality of their action; they also acknowledged their consents before the Clerk of the County Court. It would seem they had ample opportunity to weigh the pros and cons of their decision.

Courts have sometimes been inclined to favor the demands of the natural parents, while overlooking the anguish of separation inflicted on the foster parents and the child, as the Wojtkowiak case points out. In the case before us the decision must be heartbreaking for the losing parties. The 1953 amendment to the adoption statute is a humane attempt to lessen the emotional and psychological problems inherent in this type of situation. It protects all the parties involved from the ill effects attendant upon indecision and uncertainty; without this statutory safeguard, the child may very well be shuttled between two sets of parents. To make the decision of giving a child in adoption is difficult enough; subsequently to change it, once or several times, compounds the difficulties of an already complex problem. The petitioners here are young, but for legal purposes they must be assumed to be sufficiently adult, sufficiently mature, to bear, and, indeed, to reconcile themselves to, the consequences of their act. Upon careful examination of the evidence adduced upon the hearing, we have reached the conclusion that there was no proof of fraud or constructive fraud; that the consents were voluntarily given; and that petitioners were fully apprised by Green, and later by Mrs. Spencer of the Welfare De-

partment, of the finality and irrevocability of their consents.

We consider it unnecessary to pass on the right of petitioners to bring habeas corpus proceedings before the final steps for adoption have been taken, according to statute. Respondents have filed a petition for adoption in the County Court.

For the reasons indicated, the order of the Superior Court is reversed, and the cause remanded with directions that the petition for a writ of habeas corpus be dismissed without prejudice to the right of petitioners to present their objections to the adoption in the County Court.

Order reversed and cause remanded with directions.

BURKE, P. J. and BRYANT, J., concur.