People of the State of Illinois, ex rel. Beulah M. Buell, the Mother of Baby Girl Buell, a Minor, Petitioner-Defendant in Error, v. Robert M. Bell et al., Respondents-Plaintiffs in Error.

Gen. No. 11,195.

Second District, Second Division.
January 12, 1959.
Released for publication January 29, 1959.

Robert G. Scott, of Rock Island, for respondents-plaintiffs in error.

Whiteside County Legal Aid Society (L. Vernon Frye, of counsel) for petitioner-defendant in error.

JUSTICE CROW delivered the opinion of the court.

This is a review by the respondents, Claire Jordan and Juanita Jordan, by way of Writ of Error of an order entered by the Circuit Court of Rock Island County, after a hearing on a habeas corpus petition filed by Beulah M. Buell, the mother of Baby Girl Buell, a minor. The finding of the trial court was that the petitioner, Beulah M. Buell, was entitled to the care, custody, and control of Baby Girl Buell, born April 10, 1958, and that the respondents had no legal right to the custody of the child. The order directed the respondents to deliver the child to the petitioner. The order was complied with in open court and the writ discharged.

The petition for writ of habeas corpus, filed May 15, 1958, alleged, in substance, that the petitioner was the mother of the minor child born in the Community General Hospital, Sterling, Illinois, on April 10, 1958; the name of the father was legally omitted in the birth certificate; and the plaintiff is divorced and not remarried. The petitioner further alleged that she has a home for herself and her four other minor children living with her in Rock Falls, Whiteside County, Illinois; on July 1, 1957 she was divorced from her husband, Creighton Buell; in December, 1957, her ex-husband, Creighton Buell, knowing that she was expecting a child, told her that she would lose the other children because of this birth, he knew where this child could be placed for adoption, and he indicated that his employer in Rock Island would be interested in having the child. She further alleged that she went to the hospital under the care of Dr. Dora Zaeske, on April 9, 1958, where she was under a doctor's care for nine hours, and a child was born on April 10, 1958, at 8:26 a. m.; on April 12, the lawyer from Rock

84

Island came in with another woman, whom she could not identify, with some papers and asked her to sign them, but these papers were not explained to her nor did she read them, but she did sign them; because of the fact the child was illegitimate and her present children were living with her and receiving aid from the State of Illinois, she was induced to giving up the child that was to be born because she was told that she could not keep the other children if she tried to raise the illegitimate child; she alleged that she was under sedation and incapable of knowing what papers were being thrust upon her for her signature; she had no knowledge of the contents or the legal effect of those papers; and the child was handed by the petitioner to Robert M. Bell, who, in turn, delivered the child to Claire Jordan and Juanita Jordan.

Robert M. Bell was dismissed as one of the respondents. The return of the other respondents, Claire Jordan and Juanita Jordan, so far as now material, admitted they had the custody of Baby Girl Buell, and they had had the custody since April 14, 1958. They further alleged that Baby Girl Buell was delivered to them by the petitioner for the purpose of adoption; Beulah M. Buell signed the consent to adoption; Claire Jordan had been appointed guardian of the person of Baby Girl Buell by the Probate Court of Rock Island County, and they asked that the Petition for Writ of Habeas Corpus be dismissed.

The Circuit Court made certain findings, among which are: that the purported appearance and consent for adoption was not the voluntary act or deed of the petitioner; the same was procured from the petitioner by the false and fraudulent representations of Creighton Buell and the respondents' doctor, Dora Zaeske, and while she was under the influence of drugs administered by the doctor; the purported consent had never been acted upon by any court of competent jurisdiction, and was invalid, null and void; and the

petitioner did not abandon her child when she handed her to the respondents' attorney, but that her act was under the compulsion and duress of respondents' doctor and done solely to obtain her release from the hospital.

The theory of the respondents, plaintiffs in error, to the extent it is urged in their points and authorities, and argument, is that the consent to adoption executed by Beulah M. Buell is irrevocable and in full compliance with the statute; the trial court's findings that the consent to adoption was obtained by fraud, or duress, are contrary to the law and against the manifest weight of the evidence; and the trial court's finding that the consent to adoption was executed at a time when the mother was under the effect of drugs and medicines is contrary to the weight of the evidence.

Section 3–7 of the Adoption Act of 1945, which section in its present form was enacted in 1953 and subsequently amended in 1957, Ch. 4, Ill. Rev. Stats., 1957, par. 3–7, states:

"A consent to adoption or a surrender to a licensed child welfare agency for the purpose of adoption by a parent or parents including any who are minors executed and witnessed or acknowledged in accordance with the provisions of Section 3–6 of this Act shall be irrevocable unless it shall have been obtained by fraud or duress and a court of competent jurisdiction shall so find. The consent of a parent who is a minor shall not be voidable because of such minority."

The issue that is presented to this Court is whether the findings of the trial court on the questions of fact as to fraud and duress are or are not against the manifest weight of the evidence. Testifying for the petitioner was the petitioner herself; Lila McGava, a licensed practical nurse, employed at the Community General Hospital, Sterling, at the time of the occurrence; Paul Bjork, Hospital Administrator at the hos-

pital; Edna Oberbillig, the Juvenile Probation Officer of Whiteside County on April 10, 1958; and Vernice Triplett, head nurse of the Obstetrical Department in the hospital on April 14, 1958.

The witnesses for the respondents were Vernabelle Bealer, Deputy County Clerk; Robert M. Bell, attorney; Creighton Buell, the ex-husband of the petitioner; Claire Jordan, one of the respondents; and Dr. Dora Zaeske.

■ ■ The document termed a consent and admittedly signed by Beulah Buell, on April 12, 1958, bears the purported acknowledgment of Vernabelle Bealer, Deputy County Clerk of Whiteside County, Illinois. It is entitled "In the County Court of Rock Island County," Illinois; it recites in its caption: "In the Matter of the Petition of Claire Jordan and Juanita Jordan to Adopt Baby Girl Buell." The document is an entry of appearance "in the above entitled cause," a consent that any order entered by the Court as to the control, guardianship, or adoption of the child shall bind Beulah Buell, and a release of all right to custody or guardianship. There was in fact no petition for adoption of any kind on file at that time, or subsequently, in the County Court of Whiteside County, or in the County Court of Rock Island County. We have already referred to the Adoption Act, which provides that a consent to adoption, properly executed, shall be irrevocable unless it should be obtained by fraud or duress and a court of competent jurisdiction shall so find. On this issue of fraud or duress the burden of proving fraud or duress rested upon the petitioner, but, on the other hand, the finding of facts of the Trial Court favorably to the petitioner cannot be set aside on this review unless this finding is clearly and palpably erroneous, and against the manifest weight of the evidence: Cf. In re Wojtkowiak (1957) 14 Ill.App.2d 344; Flug v. Craft Mfg. Co. (1954) 3

Ill.App.2d 56; In re Matter of Gleeson (1954) 1 Ill. App.2d 409; cf. In re Petition of Balota (1955) 7 Ill. App.2d 178.

As we view the material, significant evidence, it appears that the petitioner Beulah M. Buell is the mother of four other children, three of whom live with her in Rock Falls, Whiteside County, and she and Creighton Buell, her former husband, were divorced July 1, 1957. She was graduated from the eighth grade of school. She was unemployed. She had no income except certain State Aid from the State of Illinois. Her home is clean, the other children with her appear well fed, and the home is evidently a suitable home for raising the child here concerned. In September, 1957, Creighton Buell, the ex-husband of the petitioner, and a friend and former fellow employee of the respondent, Claire Jordan, learned that the petitioner was pregnant, and asked her what the State was going to do. Then he told her that the State might take away her other children in the event she kept the child to be born, and then he suggested that the respondent, Claire Jordan, might be willing to adopt the petitioner's child to be born. Mr. Buell said that the petitioner did not really want to adopt out the child, but she was on A. D. C., did not know whether such would jeopardize her family or not, but thought it the best thing to do. Creighton Buell then contacted Claire Jordan and about 2 weeks later reported to Beulah Buell that the Jordans would adopt the child. The petitioner said it was not at her request that the Jordans were contacted. It appears also that when the petitioner was pregnant she consulted Dr. Dora Zaeske, in Sterling, Dr. Zaeske having been her mother's doctor; she told the doctor the child was going to be adopted and that all arrangements had been made. In March, 1958, respondents paid Dr. Zaeske $106 to care for the petitioner and for delivering the child; and on April 9, 1958, the petitioner entered

the Sterling Community Hospital, Sterling, Whiteside County, and, after being in labor about 11 hours and receiving divers drugs and medications under the direction of the doctor, gave birth to Baby Girl Buell on April 10, 1958. The respondents paid the $170 hospital bill April 14, 1958. The respondents had not told the petitioner they were going to pay the medical and hospital bills. She had strocillin, thiosulfil, and some seconal drugs at the hospital, the first two being preventives against thrombosis, the last being a sedative. She said that when she went into the hospital she intended to give the child away for adoption, but when she was in the hospital she did not want to give up the baby, though she did not say anything about it.

The petitioner said some papers were brought to her for signature April 10, the day the child was born, but she does not know who brought them, or what the papers were.

At the time the petitioner signed the purported appearance and consent April 12, 1958, she was in bed, in the hospital, had just 2 days previously given birth to the child after a rather long labor period, had been under some sedation, and she was having trouble with her legs. The doctor said she had severe numerous varicosities in both legs and began to complain the day after the birth that her legs were hurting. She was let out of bed earlier than ordinary to avoid phlebitis. She had extra medication for that and the doctor said that condition was pretty well controlled in 24 to 36 hours. During the night of April 11–12 she had had seconal about 9:00 p. m. and again about 2:30 a. m. The doctor said such is a short acting drug of 4–6 hours duration, and it is unusual for it to last any longer. She was without funds with which to pay the medical and hospital bills and was disturbed about them. Mr. Bell, representing the respondents, and Vernabelle Bealer, Deputy County Clerk, came to the hospital room to have her sign the consent. They had not met

89

the petitioner before. She was in bed watching television. She said Mr. Bell did not introduce himself, but identified Mrs. Bealer as a Rock Island Welfare Worker. He gave the petitioner a paper to sign which she testified he did not read to or explain to her, and which she did not read, but which she did sign. Mr. Bell testified he did correctly introduce himself and Vernabelle Bealer, asked Beulah Buell if she wanted to sign the consent, she replied that she did, and he then explained what it was, though he did not read it to her, gave her a pen, and she signed; that she had an opportunity to read it before signing it; and that Mrs. Bealer later completed the acknowledgment. Mrs. Bealer's testimony was substantially the same as Mr. Bell's. Dr. Zaeske testified she had seen the petitioner earlier that morning of April 12, having been called because the petitioner was upset, but there was nothing unusual about her appearance, and she was not at that time under a sedative.

It appears that on April 14, 1958, 2 days after signing the purported consent, the petitioner had changed her mind about giving the child up. She had been crying. The testimony of Mrs. McGava, the nurse, verifies this, and a reference to the record shows the following questions and answers to and by the petitioner:

Q. Who is Mrs. McGava?

A. She is the nurse. She came into the room when I was crying and I said: "I don't think I can go through with this." And she said: "Well—." I said: "Yes, I signed the papers." She said: "That doesn't make any difference. There is a 6 months period when you can reclaim the child."

Q. When did Dr. Dora Zaeske come to your room?

A. A few minutes after Mrs. McGava left.

Q. What did she say to you and what did you say to her?

90

A. She came into the room and she said: "What's wrong?", and I said: "Is there any reason why I can't back out?" And she said: "Who is going to pay your bills?" And I said: "I don't know; maybe I can borrow the money." And I asked her if there was a 6–months period where I could reclaim the baby and she said: "Yes, I think there is." And she left the room and came back and she said: "There is a 6–months period where you can reclaim the baby." And I said: "Without going to Court?" And she said: "Uh huh."

The petitioner was further interrogated and she gave the following answers to the following questions:

Q. Why did you intend to give your child away?

A. Because I thought the State would take the other children away from me.

Q. Is there any other reason why you decided to give away your child prior to the time of its birth?

A. I didn't have any money to pay the doctor and hospital.

There is therefore evidence the doctor said to her on the occasion of April 14, "Who is going to pay your bills?" At that time the doctor had been paid a month before by the respondents. The respondents in fact paid the hospital bill April 14. There is further evidence that the doctor told her on April 14 that she had six months in which to make up her mind, or obtain her child back. The doctor denied saying that. To the knowledge of the doctor no one was called in to advise the petitioner as to her rights to keep the child.

After the doctor had left, Mr. Bell came to the petitioner's hospital room April 14 and brought some baby clothes. She, Mr. Bell, and the nurse went downstairs, with the baby, the nurse handed the child to the petitioner, who handed her to Mr. Bell, who delivered her to the respondent Mrs. Jordan. Beginning the next day, April 15, the petitioner initiated various steps

91

seeking to get her child back and ultimately the petition was filed in this case May 15th.

Claire Jordan, one of the respondents, testified as follows in answer to the following questions:

Q. When did you talk to Dr. Dora Zaeske about paying for the doctor bill for the child?

A. Well, as I said, shortly after December 19.

Q. Did you tell Creighton Buell you would pay the medical expenses for the birth of the child?

A. I believe so, yes.

■■ The rights of the petitioner Beulah M. Buell, mother of this child, to the custody of the child are superior to those of any other person, when she is a fit person to have custody and is so circumstanced that she can provide the necessaries of life and administer to the requirements of such a charge: Cormack v. Marshall (1904) 211 Ill. 519. Adoption, which affects the course of inheritance, deprives the child of the place in which it was placed by nature, and by force of law thrusts the child into another relationship, while severing conclusively the rights and interests of the natural parents, is a very different, and more drastic matter than a change of custody; the rights of natural parents to their children must not be terminated unless a clear and convincing case is made in strict compliance with the adoption statute: Jackson v. Russell (1951) 342 Ill. App. 637. The only claims of the respondents Claire and Juanita Jordan are under the Adoption Act of 1945, as amended: Ch. 4, Ill. Rev. Stats., 1957, par. 1–1 ff, and, more particularly, the only basis for their claims is the document called an appearance, consent, and release executed April 12, 1958, which they urge is "irrevocable" under par. 3–7 of the statute. The respondents have no vested interest in the child, and, the petition herein having been filed May 15, 1958, they had little or no opportunity of developing love, affection, and attachment for the child, or the child for them.

92

Paragraph 3-7 now provides, as we've noted, "a consent to adoption . . . by a parent or parents . . . executed and witnessed or acknowledged in accordance with the provisions of Section 3-6 of this act shall be irrevocable unless it shall have been obtained by fraud or duress and a court of competent jurisdiction shall so find"—Paragraph 3-6, among other things, provides for the acknowledgment or witnessing of consents to adoptions. This purported appearance, consent, and release was evidently acknowledged in accordance with the provisions of Section 3-6. We lay aside, however, and express no opinion on the possible question, not herein briefed, of whether this document can, under any circumstances, be considered a legally effective appearance, consent, and release when there is no petition for adoption then on file anywhere, nor any filed contemporaneously. Nor could there normally be such a petition at that time since the child had not resided in the home of the Jordans at least six consecutive months immediately prior thereto. There remains the question here discussed of whether it was obtained by fraud or duress under the circumstances.

The principal cases cited by the respondents are: In re Petition of Balota (1955) 7 Ill.App.2d 178; In re Wojtkowiak (1957) 14 Ill.App.2d 344; In re Simaner (1957) 16 Ill.App.2d 48; and People ex rel. Filipkowski v. Gusterine (1958) 16 Ill.App.2d 336. In re Petition of Balota was a petition for adoption; the mother and father of the child were married; the child had been born in December, 1953; a petition for adoption was filed April 16, 1954; both the mother and father executed appearances and consents April 17, 1954 before the Clerk of the Court; the trial court found no duress or fraud as to the consents, but nevertheless denied the petition; the Appellate Court reversed and remanded. The status and position of the mother, the time, place, and other circumstances relating to the execution of the appearances and consents, and the determination of the

trial court of the fact questions as to fraud or duress were much different from the present situation. In re Wojtkowiak was a petition for adoption; the mother was not married; the child was born November 4, 1955; five days later, after the mother was released from the hospital, the attorney for the prospective adoptive parents said nothing to the mother about a consent but took her to the Cook County Bureau of Public Welfare for an interview with a welfare worker, at which the attorney was not present; the interview was about 45 minutes, at which the mother was very alert, then the attorney returned, and he and the mother went to the Clerk's office where she executed and acknowledged the consent; the defendant had seen many people about the matter, including employees of the Legal Aid Bureau, and everyone tried to help her; the trial court concluded there was no duress; the Appellate Court affirmed. The time, place, and other circumstances relating to the execution of the appearance and consent, and the determination of the trial court of the fact question as to duress were different from the instant case. In re Simaner was a petition for adoption and an intervening petition by the mother to withdraw her consent to the adoption; the child was born March 26, 1955; on September 15, 1955 the mother had a first interview with the Catholic Home Bureau, a licensed child welfare agency; October 27th she left the child at St. Vincent's Orphanage; about November 9th she discussed with the Bureau giving consent for adoption; November 23rd she signed a consent, the Bureau telling her she had 5 days to change her mind, but it was irrevocable; the trial court held there was no fraud or duress; the Appellate Court affirmed. The time, place, and other circumstances relating to the execution of the appearance and consent, and the determination of the trial court of the fact questions were different from the instant case. People ex rel. Filipkowski v. Gusterine also concerned a greatly different situation as to the

94

status and position of the parents, who were married, and the time, place, and other circumstances relating to the execution of the appearances and consents, and the Court recognized that such a case differs from proceedings that arise occasionally with respect to alleged consents given by unmarried mothers.

The proof of fraud or duress in this case lies in the facts and circumstances under which the petitioner's ostensible intention for adoption arose, and the circumstances which the trial court found existed on April 10–14, 1958. The petitioner cites the case of People v. Gilmore (1931) 345 Ill. 28 on the general principles as to fraud. At page 46, the Court states:

"Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture, . . . If fraud be proved it vitiates all transactions touched by it . . ."

██ "Moral duress" consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another, and relief is granted in such cases on the basis that the party benefiting thereby has received money, property, or other advantage which in equity and good conscience he should not be permitted to retain: 12 Ill. Law and Pract., p. 281.

The statute requires, normally, a waiting period of six months between the time when a child is taken to the home of the prospective adoptive parents and the filing of a petition for adoption. This time had not elapsed and no such petition had been filed here. We think, in this case, that from the evidence it is apparent that this proposed adoption was arranged for long before the child was born and that the doctor knew of this arrangement from petitioner and from having been

95

paid the doctor bill by the respondent Claire Jordan prior to the birth of the child. It is further apparent, however, that the mother, the petitioner, did not know or adequately understand the possibly drastic effect of signing the purported consent to adoption, which she did not read and which was not read to her, at the time it was presented to her; the circumstances, which we have heretofore recited, under which she signed the document were not conducive to the exercise of her own free will. She had never actually seen the child; the purported consent was not, and could not have been, fully made out or completed at that time, but contained misleading matters relating to the supposed petition of Claire Jordan et al. for adoption, which could only have meant, presumably, that a petition for adoption was on file at that time, or was to be contemporaneously filed, which was not, and could not normally be, the fact; the things that were said or done by her and the doctor April 14th are somewhat indicative of her attitude of mind April 12th and are somewhat explanatory of her subsequent actions of April 14th; she was an unmarried mother and subject to the normal emotional distresses that would bring; she was unemployed, under financial stress, extreme necessities, and weak; she was not physically then in good condition; her former husband's prior conversations that the State might take away her other children if she kept this child might be reasonably inferred were calculated to deceive her, as were the conversations and acts of the doctor relative to the medical and hospital bills and a so–called 6 months reclaiming period, if they were such as she testified. The trial court accepted her testimony as correct where there may have been some conflict. She acted promptly to try to obtain the child back.

We believe that the petitioner, under the circumstances, has sustained the burden of proof, not-

withstanding there is conflicting evidence, and that the consent to adoption was obtained from her by fraud or duress, within the meaning of the statute. A reviewing court will not disturb the findings of a trial court on the fact questions here involved, unless they are clearly and palpably erroneous or against the manifest weight of the evidence, and we believe such is not the case here. It was for the trial court, primarily, which saw and heard the witnesses, and which had the opportunity of observation we do not have, to determine the credibility of the witnesses, the weight of the evidence, and the reasonable inferences to be drawn therefrom.

The order will, therefore, be affirmed.

Affirmed.

WRIGHT, P. J. and SOLFISBURG, J., concur.