James Pittman and Amilly Pittman, Plaintiffs-Appellees, v. Myron F. Lageschulte and William Bein, Defendants, Myron F. Lageschulte, Defendant-Appellant.

Gen. No. 11,708.

Second District, First Division.

October 23, 1963.

Rehearing denied January 27, 1964.

Reid, Ochsenschlager, Murphy & Hupp, of Aurora (Lambert M. Ochsenschlager, William C. Murphy, Robert B. Hupp and Stephen J. Mrkvica, of counsel), for appellant.

Kramer & Kramer, of Elgin (Robert B. Kramer, of counsel), for appellees.

SMITH, J:

In May, 1961, plaintiffs, James and Amilly Pittman, obtained a $7,130 judgment against defendant, Myron F. Lageschulte, for conversion of some cows. To stay a capias, he posted bond and took an appeal. While the appeal was pending we received plaintiffs' motion requesting that it be dismissed for failure of defendant to file his brief and abstract within the allowed time. Such motion was filed in this court on January 3, 1962. Eight days later, to our surprise, we received defendant's motion requesting the same thing, but for decidedly different reasons. His motion recited that the case had been settled, that the controversy was

over and that plaintiffs had executed a Satisfaction of Judgment. Naturally, we allowed both motions, but at the time, January 12, 1962, we thought it all a bit odd. We now know what happened as a result of this present appeal, which is again by defendant, and as might be guessed, from an order setting aside the Satisfaction.

The facts are grotesque. We would just as soon skip them, but defendant raises the issue that the order is not supported by the evidence and hence we must review the entire record. If he is right it is our plain duty to reverse, for no order that is clearly erroneous and against the manifest weight of the evidence can be permitted to stand.

To review the record we must of necessity go back to the time of the first appeal of the $7,130 judgment. During its pendency defendant Lageschulte substituted attorneys. The order permitting substitution was entered by us on November 14, 1961, and we then gave his new attorney, Leonard Karlin, until November 30, 1961 to file his abstract and brief.

Finding himself pushed for time, Karlin on November 27, 1961 wrote to plaintiffs' counsel as follows:

"Dear Mr. Kramer

"As you probably know, I am substituting as counsel for the defendant appellant Myron Lageschulte in the matter of the appeal.

"I understand you were kind enough to offer to stipulate for extensions of time, if necessary, with Messrs. Huszagh; would you be kind enough to extend me a similar courtesy? I shall be most pleased to reciprocate, if the occasion arises.

"I have just received the record about ten days ago, and frankly, I am swamped. I have the abstract nearly ready for the printer, however.

"I am enclosing a copy of my Motion for an Extension of time, but I should appreciate the oppor-

209

tunity of attaching a stipulation to the original I intend filing in Ottawa.

"Thank you for your courtesy in this matter."

The courtesy was extended and we thereupon again extended the time to December 30, 1961.

Sometime after December 1, the attorneys had a telephone conversation concerning possible settlement. Karlin opined at that time, after thanking Kramer for his courtesy in signing the stipulation, that he had "a good appeal." They were not able to arrive at a settlement. On December 9, 1961, Kramer wrote to Karlin as follows:

"I was pleased to see that the Court saw fit to grant you adequate time to prepare and file your brief and abstract, to-wit to and including December 30, 1961.

"I assume that you will shortly finish your abstracting and briefing and will then return the record and transcript to the Clerk of the Circuit Court of Kane County in Geneva, Illinois.

"God willing, I am going to try to have any additional abstract and brief and argument prepared within the normal 20 days allocated to us which is 20 days after the 30th of December, 1961. Because we run over into the New Year's weekend and January 1 not being a working day, I would appreciate it if you could serve me with your abstract, brief and argument before December 30, a Saturday if this is possible. I would also appreciate your informing me when you return the record to Mr. Perkins, Clerk of the Kane County Circuit Court.

"Would you also please note that we are no longer at 5 Douglas Avenue and see that the mail-

ings correctly go to our address at 474 Summit Street, Elgin, Illinois.

Seasons Greetings,"

This was the last interchange between them during the remainder of '61, and the year closed with no abstracts or briefs on file in this court.

For Kramer, at least, this was an auspicious way to start the year. On January 2, after double checking with the Clerk, he moved, as we have seen, to dismiss the appeal for failure of defendant to file his brief and abstract on or before the due date of December 30. On January 10, Karlin followed with his motion, which we will now set forth:

## CONCURRENCE IN MOTION
## TO DISMISS APPEAL

Defendant Appellant, MYRON F. LAGE-SCHULTE, by his Attorney LEONARD KARLIN hereby concurs in the Motion of the Appellee to dismiss the appeal in the above entitled cause by reason that the parties themselves have settled their differences and the plaintiffs-appellees have executed a Satisfaction of Judgment in the cause from which appeal was taken, which Satisfaction was duly filed of record in the Circuit Court of Kane County.

There being no further controversy or issue between the parties, it is suggested that the appeal herein be dismissed and the bond released.

For Kramer, the New Year was reneging. He did *not* close his file.

On February 5, he moved to set aside the Satisfaction. His motion alleged that defendant, Myron F.

211

Lageschulte, in conspiracy with his attorney, Leonard Karlin, and his agent, Jerome Coquillard, during the month of December, 1961, had by fraud and duress secured a purported settlement and Satisfaction of Judgment from plaintiffs and that in good conscience and equity the same should be set aside. Defendant answered, by Karlin, denying that plaintiffs were entitled to any relief. The Satisfaction *was* set aside and, as noted at the start of the opinion, defendant appeals. We must thus go back again in time to see what else had been going on.

Plenty had been going on. But before narrating the action a brief description of the participants will be of assistance in following the tangled web they wove that month. Leonard Karlin, to be sure, was an attorney, although at one point in the trial, just to make sure, the court adjourned proceedings so that he might produce his license. Later on he was invited not to come back. His client, the defendant Myron F. Lageschulte, 46, was in the livestock business and had been so for a number of years. Jerome Coquillard was his employee, having worked for him since September, 1961. His salary was $150 per week. He had a formal education, not including college, and had been in the collection and real estate business, and when not otherwise occupied, "read cases quite a bit." He had an itch to play lawyer and as we shall see, he scratched it on numerous occasions. Completing the cast, are the plaintiffs, James Pittman, 50, and his wife, Amilly, 40. They had been married twenty-six years and if our arithmetic is correct, she had married when she was fourteen. Six children were at home and dependent on them, and at least one was out in the world and married. Mr. Pittman had finished the fifth grade, his wife the eighth. He had been a dairy farmer all his life. His success in his chosen field was chiefly remarkable for the lack of it. In early 1961

he had been on relief, and when the hearing began in February, 1962, the children were not in school for lack of adequate clothing. As Coquillard, with Gallic frankness remarked, "You might say they are not as smart as some people, of course." Coquillard is the Passe-partout of our story—everywhere at once, with an eye for the main chance, though he didn't need eighty days as Lageschulte's foil to accomplish the desired end.

We will try to be succinct. In November, 1961, while the appeal on the judgment was pending, plaintiffs' son-in-law desired to secure a dairy herd, but lacked the requisite credit and a few other things. He sought out defendant, who, it seems, was the person to see in those parts. Defendant naturally sent the ubiquitous Coquillard to look into it. The Pittmans apparently knew of their son-in-law's desires, but declined any involvement. That is, for a while. Suffice it to say they were soon in on the "deal," in fact, necessary parties. Pittman, with his son-in-law, were to become tenants of a farmer named Sam Greene. The judgment stood in the way of financing the cows. Accordingly, settlement negotiations were begun with the Pittmans, though nobody by now gave a thought to Kramer. They knew what his price was—it was too high. Coquillard thinks he might have told Karlin about the negotiations in either late November, or December. On one occasion, at the Greene farm, Pittman asked "what about my lawyer," and Coquillard and Lageschulte stated they just wanted him to sign. In Mr. Greene's words, ". . . they was going back and forth trying to get Pittman to sign off." During the second week in December, Coquillard was at the Greene farm almost every day, and possibly three times during the week before. The general idea of the visitations being that a "deal" could only be worked out if the Pittmans would oblige by "signing off." At one

213

point in early December, "when they first started working Pittman over," as farmer Greene put it, Coquillard told Greene, "it will take $1,000 to get his signature on it, and if he signs it it is his funeral."

Coquillard, always forward looking, prepared a settlement agreement on yellow lined foolscap of the type familiar to all lawyers, just in case. He had been taking notes as the negotiations progressed and since the agreement is dated December 12, the terms must have been pretty generally understood by that date, at least by Coquillard. The agreement is in his hand and he disclaims the use of any form book—but definitely. It has four misspellings (of the same word however) but otherwise it's pretty good:

## SETTLEMENT

"Witnesseth this agreement made and entered into this twelfth day of December, 1961 that whereas James W. Pittman and Amilly Pittman are the judgement (sic) creditors under and by reason of a certain judgement (sic) entered in the Circuit Court of Kane County, Illinois on May first, 1961 in a cause numbered #60–834 against Myron F. Lageschulte in the amount of seven thousand, one hundred sixty and no/100—($7,-160.00)—dollars and costs and whereas Addie M. Filbert has undertaken to pay the said judgement (sic) on behalf of Myron F. Lageschulte in an agreed sum in payment, settlement and satisfaction thereof, and the said James W. Pittman and Amilly Pittman have agreed to the terms of said settlement.

"Now, therefore it is agreed that for and in consideration of Addie M. Filbert paying Two thousand and no/100—($2,000.00)—dollars downpayment on a certain herd of cows purchased this

214

date from Myron F. Lageschulte by James W. Pittman and Amilly Pittman, the said James W. Pittman and Amilly Pittman hereby release and satisfy the aforesaid judgement (sic) against Myron F. Lageschulte.

"And, Addie M. Filbert further agrees to save harmless and defend the said James W. Pittman an'd Amilly Pittman by reason of any claims for attorneys fees and costs by them sustained in the above entitled action."

One can see why Lageschulte was paying Coquillard $150 a week.

What the precise chronology is, and who said what, to whom, where, before or after this handwritten instrument came into being is hard to say. Coquillard thinks that he may have told the Pittmans sometime or other that their case [read appeal] would take a long time. He knew, as did Lageschulte, and, of course, Karlin, of the appeal and that the Pittmans were represented by Kramer. It was, after all, *their* appeal. In any event, the Pittmans were to receive a herd of cows from Lageschulte, with a credit to them of $2,000 and forego their secured judgment of $7,130. Nobody, but nobody, thought of letting Kramer know, or concerned themselves with his fee—understandedly. Maybe they feared he might have something else to say.

One might have thought, since the Settlement was in longhand, that Coquillard didn't have a typewriter. Not so. Maybe he was just in a hurry with the Settlement, and the Satisfaction could await his leisure. In any event the Satisfaction is typewritten, complete with carbon copies, on forms that he had secured from the Clerk's office of McHenry County, which he made do for Kane County where the judgment was. This he says he did on the day of the settlement or the day after. While dated December 12, it is notarized on

December 20, and in Wisconsin. Apparently, Coquillard at the time he got the Pittmans to "sign off" overlooked the notarizing clause, or maybe he wasn't a notary, although this is hard to believe. After plaintiffs signed, Coquillard delivered the form to defendant. Everybody then went to Wisconsin to complete the financing, Coquillard driving the Pittmans, but of course. There it was notarized, while the financing for the herd was being arranged, this time in the presence of Lageschulte, after the plaintiffs had acknowledged to the attorney for the finance company that their signatures did in fact appear thereon. The finance company wanted to make sure that the judgment had been released before extending credit to the Pittmans and paying Lageschulte for the herd. After such had been completed, the cows started to arrive on the Greene farm and to receive Mr. Pittman's ministrations. The satisfaction having served its purpose in Wisconsin, it was returned to Coquillard who filed it with the Circuit Court of Kane County on January 4.

One more document was needed—a lease between farmer Greene and the Pittmans. For reasons not explained, Coquillard this time sought Karlin's services. This was on December 17, a Sunday. Coquillard, again at the wheel, drove to Park Forest, Illinois, picked up Karlin and drove back to the Greene farm. Busy as he was, Coquillard had not during the negotiations lost track of Karlin. Lageschulte had legal problems galore. Coquillard stated that while he had only one case he was personally interested in, Lageschulte had "at least fifteen different cases, either actions that were started or should be started in some of which Mr. Lageschulte was defendant and more of which, I believe, where he was plaintiff . . . ." Coquillard saw Karlin about once a week during November, and "frequently we contacted him by phone too . . .

216

certainly we were in touch about the appeal that was being processed." As we have seen, he mentioned to Karlin the possibility of a settlement in either late November or December. At such time, or possibly later, who can say, Karlin told Coquillard "that he could have nothing to do with it—that he did not want to hear about it or make any recommendation one way or the other—that he was proceeding with the appeal." At least this is what Coquillard says. Following the signing of the Settlement and the Satisfaction, he remembers telling Karlin of their existence on December 13 or 14, "so he would stop on his appeal." He doesn't know, but he thinks he may have called Karlin on the telephone, or maybe on December 17 when he called Karlin to come to the Greene farm and "help us get this lease done."

The meeting at the Greene farm took place between 4:00 and 5:00 p. m. Lageschulte was there, and if the original of the Satisfaction wasn't, Coquillard, as we have seen, had thoughtfully made carbons, and one of these may have been shown to Karlin. Coquillard testified that he thought Karlin was "not unhappy" about the settlement, which is one way of putting it, adding, "he did not condone the fact that I had made a settlement; he felt he had a good appeal." Previously, in discussions with Karlin, apropos of a settlement, Karlin had told him, so Coquillard testified, that "he did not want to know a thing about it; that it was an improper thing for him to know anything about . . . ." Karlin did not tell him to desist, Coquillard says, adding that if Karlin had told him to stop, he would have done so, as "I would respect my attorney's advice," which was nice of him. Karlin testified that he presumed that Kramer had been informed by his clients. In fact, on the seventeenth, at the Greene farm, Karlin says that he "naturally" would *not* have spoken to Mr. Pittman had he not known the Satisfac-

217

tion had been signed. Karlin non sequitured: "I was satisfied the case was settled, and as such Mr. Pittman was not represented by anyone, and if you are not represented, there is no longer any litigation." Satisfied that they were counselless, Karlin prepared the lease in the Greene basement, and proceeded to assist the Pittmans with the "arrangements." After all, they needed help and "he [Pittman] was not your [Kramer's] client at the time, because the case had been settled." Warming to his theme, Karlin continued:

> "The important thing is, without either the obstruction or assistance of counsel, they did what they considered their private and personal advantage mutual business . . . I have always held that any business of my clients is my business, and if someone has disposed of a matter, it's dead, once a thing is disposed of, that's it. . . . The most important fact, the essence of the case, the people had come to an agreement, and at that point I stopped working."

Needless to say, he did not advise Kramer that he had "stopped working."

The end is anticlimactic. The Pittmans having lost their judgment in December, lost their cows in January. It was all over.

We think the record, and we have by no means set out all the facts, reeks of fraud and duress. Fraud, as we know, vitiates all transactions touched by it. "Fraud includes anything calculated to deceive, whether it be a single act or a combination of circumstances, whether by the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth, or by look or by gesture . . . If fraud be proved, it vitiates all transactions touched by it . . ." People v. Gilmore, 345 Ill 28, 177 NE 711. Duress

can be physical, economic or psychological—in legal parlance we read psychological "moral." Moral duress consists of imposition, oppression, undue influence or the taking of undue advantage of the business or financial stress or weakness of another. Slade v. Slade, 310 Ill App 77, 33 NE2d 951. Duress calls for return of the property received by the offending party on the basis that in equity and in good conscience, he should not be permitted to retain it. But whether we say a transaction is vitiated, or that an offending party must return the property, the result is, of course, the same.

■■ The trial court found as a fact that the purported settlement and satisfaction of judgment were without consideration, were secured by a combination of fraud and unconscionable moral and economic duress exerted upon the plaintiffs by Lageschulte in conspiracy with Coquillard and Karlin. With this we agree. We are aware that the burden is upon the plaintiffs to prove fraud by clear and convincing evidence. Indeed, fraud is never presumed. But we are satisfied that this finding is fully justified. Majewski v. Gallina, 17 Ill2d 92, 160 NE2d 783. A reviewing court should not substitute its judgment as to the credibility of witnesses for that of the trial court unless the findings are manifestly against the weight of the evidence. It is the function of the trial judge to evaluate the testimony and it is not our job to make a reevaluation, unless extraordinary reasons are suggested, or we can say that such findings are clearly erroneous. People ex rel. Buell v. Bell, 20 Ill App2d 82, 155 NE2d 104. The trial court has a particular advantage in evaluating testimony. As was said in Burton v. State, 111 NE2d 892, 898 (Ind):

"In his effort to ascertain truth the trial judge has a conspicuous advantage. The printed or typewritten record fails to reveal to this court

219

what the trial judge so plainly sees. It is difficult enough to evaluate human testimony without trying to do so from a reading of testimony. Such does not reveal the appearance of the witness, his composure or lack of it, his changing facial expressions, the ready response, the halting answer, *the appealing glance of counsel,* and the many indicia of truth or falseness that mean so much to the experienced lawyer or judge."

With regard to "the appealing glance of counsel," which we have italicized above, the hearing produced this interesting aside. Mrs. Pittman was being questioned by Kramer and he asked this question:

"Then did you see Mr. Karlin in December at all?"

The Court: "Let the record show that defense counsel, Mr. Karlin attempted to indicate to the witness by shaking his head."

In fairness, we should note the protestation of Karlin that he was "not shaking his head." We will accord to the trial judge a greater perceptiveness than we could have, for the sensible facts are read better from the living witness than from the very dead record before us.

██ Karlin's conduct is particularly reprehensible. He is an attorney. He and Kramer had talked settlement in the early part of December. The figure bandied about at that time was $2,500 to $3,000. It had been rejected. When he heard that negotiations for settlement were under way, he had a professional duty to advise Kramer. Canon 22 of the Canons of Professional Ethics begins by stating: "The conduct of a lawyer before the court with other lawyers should be characterized by candor and fairness . . . ." And Canon 41 reads:

> "When a lawyer discovers that some fraud or deception has been practiced which has unjustly imposed upon the court or a party, he should endeavor to rectify it; first by advising his client and if his client refuses to forego the advantage thus unjustly gained, he should properly inform the injured person or his counsel so that they may take appropriate steps."

Karlin cannot escape his responsibilities by his bland assumption that since the case had been settled the Pittmans were no longer represented by counsel. What is more, "candor and fairness" dictated that he advise Kramer that negotiations were under way prior to the supposed settlement. He acknowledges as much in his statement to Coquillard, "that it was an improper thing for him to know anything about. . . ." He misreads the canon. The canon does *not* say that it is improper to know of improprieties. It says that it is improper for a lawyer not to inform opposing counsel of their presence.

Karlin's facile answer to the commands of the canon is that clients can do as they please—

> "If they are three times seven years, they are entitled to make disposition and make mistakes and deal with whom they please. They may take our advice or not, but that is their privilege, but we do not own our clients."

Which is apropos of nothing at all. If the Settlement was in fact the work of the clients, divorced from their lawyers, as Karlin maintains, why not so immediately advise Kramer instead of taking the heavy-handed tack that he did with his "Concurrence in Motion to Dismiss." His silence is revealing. What is more, since the agreement provided in a back-handed way for Kramer's fees, Karlin could have

221

made inquiry at least as to what they were. His client was, after all, seemingly responsible for them under the agreement. But he says he took no interest in how they were to be paid. On the other hand, he testified: "I did ask Mr. Lageschulte if he ever received an attorney's lien in this, and he said 'No, definitely not,'" which is apropos of a great deal. He was thinking about Kramer's fees all right!

"A lawyer," Canon 16 reads, "should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought not to do . . . ." He knew that the case could not be settled with Kramer. That avenue had been tried. Any settlement, therefore, had to be effected without him. Karlin knew, or is charged with knowing, that he was forbidden by Canon 9 from "in any way communicating upon the subject of the controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel." The intimate relationship between Lageschulte, Coquillard and Karlin belies Karlin's stance that he was above it all, that he was not under a duty to restrain Lageschulte and Coquillard from "doing those things which the lawyer himself ought not to do." When advised of the negotiations by Coquillard he gave no thought to telling them to stop. This is hardly restraining a client "from doing those things which the lawyer himself ought not to do." It is just the opposite. The inference is there to be drawn—and a reasonable inference it is—that the acts of Coquillard, Lageschulte and Karlin were the acts of each other in unholy combination.

We appreciate the argument of present counsel [who had nothing whatsoever to do with any of the events narrated] that the wheels of commerce would slow if courts allow persons to avoid their agreements,

and we do not lightly affirm this matter. But more than the wheels of commerce would slow if we were to permit satisfactions of this kind to stand. Counsel struggle with a factual situation permeated with fraud and duress. They, of course, had nothing to do with it, but had to take it as it came to them. We are convinced that the order below was proper and accordingly the order is affirmed.

Affirmed.

McNEAL, PJ and DOVE, J, concur.