People of the State of Illinois, ex rel. Eunice Karr, the Mother of Baby Boy Karr, Also Known as Douglas Daniel Karr, Jr., a Minor, Petitioner-Appellant, v. Rev. LeRoy F. Weihe, Executive Director of the Nachusa Lutheran Home for Children, a Charitable Corporation, Harry R. Bates and Anna Lou Bates, Respondents-Appellees.

Gen. No. 11,480.

Second District, Second Division.

May 16, 1961.

Rehearing denied June 7, 1961.

Edward Keefe, of Rock Island, for appellant.

Besse & Besse, of Sterling, and Harold R. Nettles, of Freeport, for appellee.

CROW, P. J.

The petitioner-appellant, Eunice Karr, the natural mother of Baby Boy Karr, also known as Douglas Daniel Karr, Jr., initiated proceedings for a writ of habeas corpus on March 17, 1960, the writ being returnable March 24, 1960, to recover custody of her infant son from an Illinois licensed child welfare agency, the Nachusa Lutheran Home for Children, which had received custody of the child four days after his birth by virtue of purported surrenders and consents executed by both natural parents. Rev. Leroy Weihe, Executive Director of the Nachusa Home is one of the respondents-appellees. The natural father is not a party. The petitioner does not question the form of the surrenders or consents, and admits signing the same, but alleges that the document bearing her signature is void for fraud and duress, or, by analogy to the language of Section 11 of the Adoption Act of 1959, Ch. 4 Ill. Rev. Stats. 1959, par. 9.1–11, that it is revocable for such cause; that she is a fit person to have the care and control of her son; and that she is entitled to his custody. After service upon it of the writ which duly issued herein the agency,

363

the Nachusa Home, by its executive director, Rev. Weihe, entered an appearance in an adoption cause pending elsewhere and consented to the child's adoption by persons unknown to the petitioner herein to whom the agency had delivered custody prior to her application for the writ herein. Subsequently, by an amended return to the writ in this cause, the agency concerned, Nachusa Home, set forth that custody of the child had been given by it to adoptive parents and that an interim order of adoption entered by the County Court of Stephenson County, Illinois on April 1, 1960 had terminated the parental rights of the petitioner herein. Thereafter, on the petitioner's motion, the purported adoptive parents, Harry R. Bates and Anna Lou Bates, were made additional respondents to the present proceedings. In her denials of the respondents' amended returns, the petitioner reasserts that her surrender or consent is void for fraud and duress, and that she is a fit person to have the care and control of her baby, and alleges that the interim order of adoption purporting to terminate her rights is void for lack of jurisdiction. This cause was tried before the court upon the petition, the respondents' amended returns, and the petitioner's denial thereof. The court found that the petitioner had failed to establish that her surrender and consent given to the agency was obtained by fraud or duress and that the writ herein should be quashed. A judgment was entered accordingly, July 7, 1960, and custody was remanded to the respondents Harry R. Bates and Anna Lou Bates. The petitioner appeals. There was no evidence that the petitioner was an unfit person.

In the petition for writ of habeas corpus, the petitioner alleges that her surrender and consent is void (or revocable) for one or more of the following reasons:

(a) At the time she signed, she was a patient at Community General Hospital in Sterling, Ill.,

under the influence of drugs, in a mental and emotionally unstable condition, recovering from the effects of her first child-birth, and by reason thereof she was unable to comprehend the significance of her act.

(b) She was misinformed as to the nature and effect of said instrument and was without advice, and believed she could reacquire custody of her child.

(c) While in said condition, her husband represented he was unable to afford said child, etc., and that it was in the child's best interest that he be given up, thereby fraudulently inducing or unduly influencing her to sign a surrender and consent, well knowing she was at that time misinformed as to the nature and effect of such act and believed that she could later reacquire custody; that she would not have signed said instrument except for her weakened mental and physical condition, her misinformation as to the nature and effect of said instrument, her lack of advice, and the fraud or undue influence or duress of her husband.

The petitioner-appellant's theory is that the finding and judgment are contrary to the manifest weight of the evidence and to the law, and, there being no evidence of her unfitness, her fitness is presumed, and hence it was error to remand custody to the respondents Harry R. and Anna Lou Bates. The respondents-appellees' theory is that the finding and judgment on the issue of fraud and duress is supported by the manifest weight of the evidence and the law, the petitioner's surrender or consent was irrevocable, no showing or finding of her unfitness is necessary, and though she be a fit person she is not absolutely entitled to custody, the best interests and

welfare of the child being the paramount consideration, and it was proper to remand custody to the respondents Harry R. and Anna Lou Bates.

The petitioner was married to Douglas Karr on September 7, 1957 upon his graduation from high school and at the completion of her sophomore year. She was then 16 years old. During 1959 they lived in an apartment in Sterling, which they rented for $65 per month, and Douglas Karr worked in Rock Falls, where he earned $59.00 per week. On March 30, 1959 she learned she was pregnant. The child was to be their first. When she told her husband that evening he said they could not afford a baby at the present time because he was obligated to buy a house (which they were at that time, though later released). He then left the apartment to see if the Mt. Carmel Home for Children, at Morrison, would keep the child. At that time the Karrs indicated they simply wanted to place the child temporarily in a home until their financial condition should improve, and nothing was said by them then about adoption.

On October 12, 1959 they visited the Nachusa Lutheran Home for Children at Nachusa and talked with a caseworker. There Mr. Karr again told of his financial problems and asked if the home took in infants. He stated that he did not want children, but that he and Mrs. Karr sought only a temporary placement of the child. Later, October 16, 1959, the Karrs returned to the Nachusa Home and had a lengthy interview with Rev. Weihe, the Executive Director. The Home is a duly licensed child welfare agency. Rev. Weihe explained that to place the child in a foster home on a temporary basis would cost the parents approximately $75.00 per month, and that the only alternative, in fairness to the child, would be to place the child for adoption. The Karrs agreed that they could not afford a foster home and Mrs. Karr

indicated that she was willing to go along with her husband in the matter. Nothing was settled. That was the last time Mrs. Karr saw Rev. Weihe until November 30th at the hospital after the child was born when her surrender or consent was signed.

Rev. Weihe testified that he discussed the matter of adoption with Mr. Karr on October 30; that Mr. Karr came alone; and Mr. Karr told him that he and Mrs. Karr had discussed the matter at home and had decided to place the child for adoption. Karr made inquiry regarding the adoptive parents' paying for the doctor and hospital bills, and Rev. Weihe told him he thought that adoptive parents could be found that would pay such, and that the Nachusa Home would pay the bills and the adoptive parents in turn would pay the Home. At another meeting, November 13th, with Mr. Karr he said that Karr told him they had reached a decision, and Karr wanted to know if his wife could have a private room at the Sterling Hospital when she was taken there for confinement because he thought it would be embarrassing for her to be in a hospital ward where the other mothers were keeping their babies. Rev. Weihe called the Hospital office and made appointments for November 27th.

On November 26, 1959 the petitioner entered Community General Hospital in Sterling. That same evening of November 26th, at about 9 p.m., the baby was born. The attending physician, Dr. Redmond, stated the birth was an uneventful one. However, he further stated that the delivery was not routine because it was necessary to remove the placenta manually and that this is not normal. The drugs prescribed for Mrs. Karr were routine, according to the physician, excepting the cyclopropane which was administered for the removal of the placenta. This is a potent gaseous agent administered by a mask and its administration is exacting. In his own practice the doctor said he

does not always use it for a manual removal of the placenta. He leaves the decision to an anesthetist. He testified that incisions were made for the childbirth, and that they were closed with sutures. He also testified that involution, during which the uterus, having been enlarged to admit a six-pound baby, contracts to its normal size over a six week period, becomes painful to the mother after a few days.

On November 27th, the next day after the baby was born, the Rev. Elmer Dadisman, Mrs. Karr's pastor, called at the hospital to see her. Rev. Dadisman testified that he told her he had heard that she and her husband did not want to keep their child. She replied that this was not correct. Mrs. Karr shed tears and said it was simply that they could not afford to. She explained that when she got out of the hospital she intended to get a job and hoped to get the baby back, and that she would have a year's time to do so.

Rev. Dadisman left the hospital after that visit with the petitioner and later that evening he conferred with Rev. Weihe. He told Rev. Weihe of his conversation with Eunice (Mrs. Karr); that she expressed an intention of getting the baby back by acting within a year; and he inquired of Rev. Weihe as to whether it was correct that Mrs. Karr would have a year to do so. Rev. Weihe advised that it was not correct.

Rev. Dadisman then contacted Douglas Karr, the father, and told him of his wife's apparent misinformation as to the possibility of her getting the child back within a year, and of his (Rev. Dadisman's) conversation with Rev. Weihe. Rev. Dadisman never had occasion to visit with Mrs. Karr again while she was in the hospital. Douglas Karr, the father, testified that he did not tell his wife about the conversation he had had with Rev. Dadisman because "it would make it easier for her to sign if she did not know."

On November 30, 1959, in the evening, about 96 hours or a little less after the birth of the child, Rev.

Weihe took the surrender or consent papers to the petitioner at the hospital. He arrived at 8:30 p.m., had the papers signed by both Mr. and Mrs. Karr, and he had departed by 8:45 p.m.—the whole operation evidently requiring about 15 minutes. Walking at that time was not easy for her and it was difficult when she walked a short ways to an ante-room with her husband and Rev. Weihe. He did not tell Mrs. Karr of his conversation with Rev. Dadisman on November 27th, or that she did not have a year to get the baby back. He testified, however, that he told both parties that the papers were final, and both parties read them, or he read the papers to them. Mrs. Karr testified that she couldn't remember whether there was any discussion about the papers being final. The written surrenders or consents for adoption had been prepared by Rev. Weihe's attorney. According to Rev. Weihe, the petitioner was never invited by him to consult with his or any other counsel. Although both Rev. Weihe and Douglas Karr admitted they fully knew of Mrs. Karr's misapprehension or mistaken belief that she had a year to get the child back, and that she intended to get a job when she got out of the hospital and hoped to get the baby back, both of them admitted that they did not advise her to the contrary as to the possibility of her getting the child back.

There are some other facts in evidence, of lesser present importance, which need not be here detailed— some regarding the administration of drugs in the hospital to Mrs. Karr in connection with and after the birth, and some concerning the fitness of the petitioner and Harry R. and Anna Lou Bates. There was no evidence of unfitness of any party.

We believe from reading the evidence that Douglas Karr, the father, knew and comprehended that the consents or surrenders for adoption were final. His testimony is reasonably clear that at the time he did

369

not want the child, that he wanted to place it out for adoption, and that he understood fully that the signing of the adoption surrender or consent by him on November 30th was final.

Mrs. Karr left the hospital December 1, 1959 without the child and without ever having seen the baby. She testified that no one ever offered to bring the baby to her and she never told any one in the hospital that she did not want to see him and that she did not ask to see the baby.

On December 3, 1959 Douglas Karr telephoned Rev. Weihe and asked if the baby was still in the Nachusa Home. Rev. Weihe told him that the child was not—that the child had already been placed for adoption. It appears from the evidence that Rev. Weihe had told Harry R. and Anna Lou Bates, respondents and purported adopting parents, that on the night of November 30th the baby was available to them and had placed the child December 2, 1959 with them for adoption.

Section 3–7 of the Adoption Act of 1945, as amended, Ch. 4 Ill. Rev. Stats., 1959, par. 3–7, which was in effect at the time this surrender or consent was executed, provided that:

"A consent to adoption or a surrender to a licensed child welfare agency for the purpose of adoption by a parent or parents including any who are minors executed and witnessed or acknowledged in accordance with the provisions of Section 3–6 of this Act shall be irrevocable unless it shall have been obtained by fraud or duress and a court of competent jurisdiction shall so find. The consent of a parent who is a minor shall not be voidable because of such minority."

The Adoption Act of 1959, Ch. 4 Ill. Rev. Stats., 1959, pars. 9.1–1 to 9.1–24, effective January 1, 1960,

repealed the Adoption Act of 1945, as amended, but pars. 9.1–23 and 9.1–11 of the Adoption Act of 1959 provide:

"9.1–23. Sec. 23. REPEAL—SAVING.) 'An Act in relation to the adoption of children and to repeal an Act therein named', approved June 30, 1945, as amended is repealed.

Such repeal shall not in any way affect an act done or a right, power or remedy given or accrued under any statute in force prior to the effective date of this Act.

The execution of a consent or surrender, prior to the effective date of this Act, shall not affect its validity for use in a proceeding under this Act, if such consent or surrender was executed in accordance with law then in effect."

"9.1–11. Sec. 11. CONSENTS—IRREVOCABILITY.) A consent to adoption by a parent, including a minor, executed and acknowledged in accordance with the provisions of Section 8 of this Act, or a surrender of a child by a parent, including a minor, to an agency for the purpose of adoption shall be irrevocable unless it shall have been obtained by fraud or duress and a court of competent jurisdiction shall so find. The consent of a parent who is a minor shall not be voidable because of such minority."

██ ██ The issue that is presented is whether the findings of the trial court on the question as to alleged fraud and duress with respect to the purported surrender or consent of the present petitioner, Eunice Karr, the natural mother, are or are not against the manifest weight of the evidence, or the law. Was her consent or surrender "obtained by fraud or duress"? The burden of proving fraud or duress rested upon

371

the petitioner and the findings of fact of the trial court against the petitioner may not be set aside unless clearly and palpably erroneous and against the manifest weight of the evidence.

■■ The general principles as to fraud are set out in People v. Gilmore (1931) 345 Ill. 28, 177 N.E. 710, where, at page 46, the Court stated:

> "Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture, . . . If fraud be proved it vitiates all transactions touched by it . . . ."

■ We have carefully reviewed the testimony and conclude that there was not sufficient evidence for the trial court to find that the petitioner's surrender or consent to adoption was signed at a time when she was under the influence or effect of drugs and medications, though the time and place of the signing thereof and her then physical condition, which was obviously weakened and not normal, are material, relevant facts and circumstances bearing on the ultimate question of fact. But we also conclude that the evidence is uncontradicted that she signed her surrender or consent under the mistaken belief and misapprehension that she had one year to get the baby back. That was certainly a material, relevant fact and circumstance so far as she was concerned, and was undoubtedly a material inducement to her execution thereof. Her husband knew of her mistaken belief or misapprehension. Rev. Weihe knew of it. This mistaken belief or misapprehension was communicated by her to her Minister, Rev. Dadisman, and he, in turn, immediately communicated such to Rev.

372

Weihe. Neither her husband or Rev. Weihe made any effort to clarify or dispel that mistaken notion, belief, or misapprehension after they knew thereof. They remained silent in that regard though they had ample opportunities to say something in that respect to her. It is apparent that although she read this surrender or consent and was told that it was final, she did not know or adequately understand or comprehend the drastic final effect of signing the same. Rev. Weihe was familiar with the laws of adoption. He had the services of an attorney in preparing the surrender or consent. He had discussed the laws of adoption with Douglas Karr but not with or in the presence of Mrs. Karr. We cannot escape the conclusion that both Rev. Weihe and Douglas Karr knew of her mistaken belief or misapprehension that she had one year to obtain a return of the baby. By their silence, with such knowledge, at the critical time of the signing of the surrender or consent by Mrs. Karr, so far as she is concerned, they suppressed the truth concerning her mistaken belief or misapprehension. The circumstances cried out that, knowing what they knew, they then and there correct her mistaken belief and misapprehension on that highly important point. They did nothing. Presumably that was because, as Mr. Karr testified, "it would be easier for her to sign it if she did not know."

The rights of the petitioner, the natural mother of this child, to the custody of the child are superior to those of other persons, when and if she is a fit person to have custody, has not forfeited that right by some act of her own, and is so circumstanced that she can provide the necessaries of life and administer to the requirements of such a charge: People v. Bell (1959) 20 Ill.App.2d 82, 155 N.E.2d 104; People v. Sheehan (1940) 373 Ill. 79, 25 N.E.2d 502; Cf. Cormack v. Marshall (1904) 211 Ill. 519, 71 N.E. 1077;

Stafford v. Stafford (1921) 299 Ill. 438, 132 N.E. 452; the interests and welfare of the child are presumed to be best served in the custody of the parent: People v. Hoff (1944) 323 Ill. App. 535, 56 N.E.2d 324.

█ The only claims of the respondents are under the Adoption Act of 1945, as amended, or the Adoption Act of 1959, and the only basis for their claims is the document called a surrender or consent executed by the petitioner November 30, 1959 which they urge is "irrevocable", under Ch. 4 Ill. Rev. Stats., 1959, par. 3–7 or par. 9.1–11. The respondents have no vested interest in the child, and, the petition herein having been filed March 17, 1960, less than 4 months after the birth of the child, they had little or no opportunity of developing love, affection, and attachment for the child, or the child for them. The petitioner acted reasonably promptly to try to obtain the child back: People v. Bell, supra.

It is not without significance that this purported surrender or consent was taken the evening of November 30, 1959, barely 96 hours or possibly less, after the birth of the child. Although the present Adoption Act of 1959 was not effective until January 1, 1960 it had been approved July 17, 1959 and doubtless was familiar to those particularly concerned with adoption matters. Under Section 9 thereof, par. 9.1–9, "No consent or surrender shall be taken until the passage of 72 hours after the birth of the child." The present surrender or consent was taken barely 24 hours, or less, beyond the 72 hours after the birth of the child within which, after January 1, 1960, no such consent or surrender in the form used herein could legally have been taken under any circumstances. That legislative emphasis upon one important fact and circumstance, namely timing, and that public policy determination and absolute statutory inhibition, though

374

technically not in effect until January 1, 1960, should not go unnoticed when the consent or surrender here was taken barely 24 hours, or less, beyond the time absolutely forbidden as of January 1, 1960.

■ We have considered the age of the petitioner and the other applicable facts and circumstances as to time, place, her physical condition, and others, under which this surrender or consent was signed. Mrs. Karr had quit high school and married when she was in her sophomore year. At that time she was only 16. She was only 18 when this child was born. Taking into consideration her age and experience, the time and place where the signing occurred, her then physical condition, that she'd never been in a hospital before, and this being her first child, and the fact that she was obviously not familiar with the laws of adoption, though Rev. Weihe and her husband who were asking her to sign the surrender or consent were, we are of the opinion that, under the circumstances, the failure of Douglas Karr, her husband, and Rev. Weihe fully to inform her in the respect concerned and remove the mistaken belief or misapprehension on a material point under which she, to their knowledge, labored, was calculated to deceive and amounted to deception and fraud. This surrender or consent to adoption by Mrs. Karr was obtained by fraud within the meaning of the statute and, hence, was revocable.

We have considered all the cases referred to by the respondents, namely, Giacopelli v. Florence Crittenton Home (1959) 16 Ill.2d 556, 158 N.E.2d 613, Huber v. Huber (1960) 26 Ill.App.2d 207, 167 N.E.2d 431, Kokotekian v. Kokotekian (1959) 23 Ill.App.2d 171, 161 N.E.2d 712, In re Petition of Simaner (1959) 15 Ill.2d 568, 155 N.E.2d 555, People v. Gusterine (1958) 16 Ill.App.2d 336, 148 N.E.2d 1, In Matter of Petition of Balota (1955) 7 Ill.App.2d 178, 129

375

N.E.2d 234, and In Matter of Petition of Wojtowiak (1957) 14 Ill.App.2d 344, 144 N.E.2d 760. We do not believe they militate against our views in the case at bar.

Under the circumstances, the decision of the Trial Court was, in this case, against the manifest weight of the evidence and the law. The Order will be reversed and the cause remanded with directions to enter a judgment for the petitioner and that the respondents deliver the child to the petitioner.

Reversed and remanded with directions.

SPIVEY, J. and WRIGHT, J., concur.