STEPHEN DINES HALE *et al.*, Plaintiffs-Appellees, *v.* MARK HALE, a Minor, *et al.*, Defendants-Appellants.

Fifth District   No. 76-384

Opinion filed January 23, 1978.—Rehearing denied February 21, 1978.

CARTER, J., dissenting.

Daniel J. Mulvanny and A. Robert Kassin, both of Land of Lincoln Legal Assistance Foundation, Inc., of Alton, for appellants.

Charles H. Jungels, of Granite City, and John P. Long, of Lebanon, for appellees.

Mr. JUSTICE KARNS delivered the opinion of the court:

This is an appeal from an order of the Circuit Court of Madison County entered on the petition of Siglinde Hale to revoke her consent to the adoption of her infant son, Mark Hale, and to vacate the decree of adoption entered in favor of his paternal grandparents, Stephen and Alma Hale. In her petition, Siglinde alleged that her consent to the adoption of her son had been obtained from her on the basis of fraudulent misrepresentations made by her husband, Stephen Hale, Jr., and his parents. The lower court denied the petition on the grounds that Siglinde Hale had failed to sustain her burden of proof.

In 1972, Siglinde, a native of Germany, married Stephen, Jr., who was stationed in her country while on military service. A son, Mark Hale, was born to the couple on September 12, 1973. Siglinde and her infant son moved to this country in August 1974, at which time they moved into the home of the child's paternal grandparents. Following his discharge from the military, Stephen, Jr., joined his wife and son in his parents' home in October 1974. Soon after his father's arrival home, Mark began walking and the severe difficulties he experienced in this regard were the subject of several family discussions. Although the child frequently fell while learning to walk, there was never discovered to be anything physically

wrong with the boy's feet as Siglinde was allegedly told by her husband and his parents.

Sometime in October 1974, the matter of the adoption of Mark by his grandparents was discussed by the parties although the nature and frequency of those discussions are disputed. At about this time the grandparents retained counsel for legal advice concerning the adoption of their grandson. The child's parents also met with the grandparents' attorney at this time and Siglinde, without her husband, went to the attorney's office three or four times thereafter.

As a result of these discussions, the parents appeared before Judge William Johnson on December 10, 1974, to consent to the adoption of Mark by his grandparents. Both parents were therein admonished by Judge Johnson of the permanent effects of their consent to Mark's adoption and both parents acknowledged to him that they understood that the consents were irrevocable. During these proceedings, Stephen Hale, Jr., and his parents' attorney, who had accompanied the couple, remarked that the child had a crippled foot to which Siglinde responded that the child was not crippled. When Siglinde inquired whether her son could someday be sent back to her, Judge Johnson explained to her that it would be possible but that the child's grandparents would need to follow the same procedures as they had, and that they would be under no obligation to do so. At the end of these proceedings the parents executed their consent to the adoption. On December 13, 1974, the child's grandparents filed a petition for the adoption of Mark Hale and included with their petition the consent forms executed earlier by the child's parents. After a hearing on their petition on January 24, 1975, the Circuit Court of Madison County decreed that Mark Hale was the adopted child of Stephen and Alma Hale.

On September 11, 1975, Siglinde Hale filed a petition to revoke her consent and set aside the adoption alleging that her consent to the adoption was obtained by fraud and duress on the part of her husband and the child's grandparents. She also alleged that the consent form she had executed was invalid because it failed to comply with the prescribed standards of section 10 of the Adoption Act (Ill. Rev. Stat. 1973, ch. 4, par. 9.1—10) in that it failed to inform her of the irrevocable nature of her act of consent.

At the time of the hearing on the petition on May 13, 1976, Siglinde was no longer living with her husband nor residing in his parents' home. At the hearing she attempted to show that at the time she consented to her child's adoption she was a naive youth, unfamiliar with the English language and completely dependent upon her husband and his parent's advice and support. She testified that they had intentionally deceived her as to the permanent consequences of the adoption and as to the nature of and

reasons for the December 10, 1974, proceeding. Siglinde further testified that she first met the grandparents' attorney on the day she signed the consent to adoption before Judge Johnson and that her responses to the judge's questions at that proceeding were made at her husband's direction. She explained that she had told Judge Johnson that she understood the effects of her consent to her child's adoption because she had been instructed to do so by her husband.

Siglinde went on to relate that her child's difficulty in walking had been explained to her by her husband and his parents to be caused by a foot problem that required immediate corrective surgery to prevent her son from being crippled. She said that in late November 1974, her husband and mother-in-law told her that because she and her husband, Stephen Jr., could not afford to take Mark to a doctor she should sign a paper so that her father-in-law's medical insurance would pay for the necessary operation. Siglinde testified that her mother-in-law repeatedly warned her that the child would be crippled if he did not have the operation and that she asked her daily to sign the paper. She stated that three days before she signed the consent she was first told the paper was an adoption consent form and that by means of the adoption her son would be able to have the operation. Her mother-in-law, according to Siglinde, assured her that Mark would be returned to her after the operation was performed. Out of fear that her son would otherwise be crippled, Siglinde finally agreed to consent to the adoption.

Judge Johnson, over the objections of Alma and Stephen Hale, testified on Siglinde's behalf at the hearing on the petition to revoke the consent and vacate the adoption decree. He testified that at the consent to adoption proceeding Siglinde spoke broken English and appeared to have difficulty understanding all that was said, often looking to her husband for advice and counsel. He also stated that at some time prior to or immediately after his taking of the consents that he had a discussion with Siglinde and her husband regarding the purpose of the adoption. This discussion, he related, indicated to him that the child's grandparents intended to adopt Mark so as to cause his grandfather's medical insurance policy to pay for the child's necessary medical treatment. After the medical treatment the grandparents were to consent to the return of the child to his natural parents by means of another adoption. According to Judge Johnson, when he told Siglinde that neither he nor she and her husband could force the grandparents to return the child she became very upset and her husband began to console her. The foregoing discussion was private and off the record.

Siglinde's husband and his parents testified in response to her allegations of fraud and duress that they had never pressured her into consenting to the adoption nor had they told her that the child would be

crippled unless he had corrective surgery performed on his foot. Moreover, their factual version of the events leading up to Siglinde's consent to the adoption revealed that not only was Siglinde's consent voluntarily given, but that she had promoted the idea to them.

Stephen Hale, Jr., testified that he and Siglinde first discussed the subject of Marks' adoption by his grandparents while the couple was still living in Germany. He stated that Siglinde did not want the child and had hoped that his parents would adopt him so that they would be free to travel around the United States upon their return from Germany. He further testified that approximately two weeks after his discharge from the military he and Siglinde asked his parents if they would adopt Mark. He stated that thereafter Siglinde repeatedly asked Alma Hale if she and her husband would adopt the child. According to Stephen Hale, Jr., he worried about Mark's difficulty in learning to walk and in discussing this with Siglinde he often suggested that the boy be taken to a doctor. He stated, however, that he had never represented to her that the child had a physical problem that required corrective surgery and that in his opinion Siglinde was not overly concerned about the child's supposed foot problem. According to his testimony, Siglinde was aware at the time she consented to the adoption that he had a medical insurance policy that covered the child and that, in fact, Siglinde had filed a claim under the policy for a minor operation performed on Mark soon after he and his mother arrived in this country. He further testified that Siglinde was fully aware of his monthly income of $560 from State unemployment compensation and the military.

Alma and Stephen Hale both testified at the hearing that they had never believed nor represented to Siglinde that anything was physically wrong with Mark's feet that would necessitate immediate medical treatment. They admitted that they had discussed Mark's difficulties in learning to walk with Siglinde, but that they had told her the child was simply a slow learner. According to their testimony, Siglinde first asked them if they would adopt the child a few days after she and the infant arrived in this country in August 1974. Siglinde explained to them that she wanted to give up Mark so that she and her husband would be free to travel and have a good time. They testified that they frequently discussed the matter of Mark's adoption with Siglinde and their son and that they sought to ensure that they wanted to give up the child. The couple further testified that when they first sought legal-advice concerning the adoption in late October 1974, Siglinde and their son accompanied them to the lawyer's office.

Several other witnesses testifying on behalf of Alma and Stephen Hale stated that Siglinde rarely cared for Mark after she and the child moved into the Hale's home, leaving the daily care of Mark in Alma's hands.

They also corroborated the Hale's contentions that Siglinde understood English well and that she conversed in the language with little difficulty.

During the hearing on her petition, the trial court at one point forbade Siglinde's appointed interpreter from continuing a discussion with Siglinde's attorney at the counsel's table because of the disruption caused while the adoptive parents were presenting evidence. At the commencement of the next day's proceedings the court reversed its earlier ruling, but during the time it was in effect Siglinde's husband and mother-in-law had testified.

The trial court denied Siglinde's petition to revoke her consent and to vacate the adoption for the reason that she had failed to sustain her burden of proof. On appeal, Siglinde Hale contends that the trial court's denial of the petition was against the manifest weight of the evidence and that she was denied her rights to effective assistance of counsel and to cross-examine witnesses by the trial court's refusal to allow her to confer with her attorney through her interpreter.

■■■ Under section 11 of the Adoption Act (Ill. Rev. Stat. 1973, ch. 4, par. 9.1—11) a consent to adoption executed and acknowledged in accordance with the provisions of section 8 of the Act is deemed to be irrevocable unless it is shown to have been obtained by fraud or duress. This section has been construed to be a reflection of a clear legislative recognition of the strong public policy favoring the finality and stability of adoptions. (*In re Hoffman*, 61 Ill. 2d 569, 578, 338 N.E.2d 862, 867 (1975).) The burden of proving fraud or duress rests upon the party challenging the validity of the consent, and the findings of a trial court as to this issue may not be set aside on appeal unless contrary to the manifest weight of the evidence. (*People ex rel. Drury v. Catholic Home Bureau*, 34 Ill. 2d 84, 93-94, 213 N.E.2d 507, 512 (1966).) Our supreme court has recently concluded that the legislative restriction on the revocability of consent imposed by the 1973 amendment to section 11, which provided that the fraud or duress supporting a revocation must have been committed by the person taking the acknowledgment to the consent or the adopting parents or their agents, was an attempt to add greater certainty to adoption proceedings and was a repudiation by the legislature of the totality of circumstances approach previously employed by courts in this State. (*Regenold v. The Baby Fold, Inc.*, 68 Ill. 2d 419, 369 N.E.2d 858 (1977).) Accordingly, our review of this cause is limited to those proofs of fraud and duress as was allegedly exerted by the adoptive parents, Alma and Stephen Hale.

■■ Generally, "[f]raud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by

direct falsehood or by innuendo, by speech or by silence * * *" (*People ex rel. Chicago Bar Association v. Gilmore*, 345 Ill. 28, 46, 177 N.E. 710 (1931)). For a misrepresentation to constitute fraud, as is claimed in the instant cause, it must be a false statement of material fact intentionally made to induce another party to act in reliance on the truth of the statement. *Roth v. Roth*, 45 Ill. 2d 19, 23, 256 N.E.2d 838, 840 (1970).

■■ The most often cited definition of duress in adoption revocation cases was stated in *People ex rel. Drury v. Catholic Home Bureau*, 34 Ill. 2d 84, 92-93, 213 N.E.2d 507, 511 (1966):

" 'Duress has been universally defined as a condition which exists where one is induced by the unlawful act of another to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the execution of the contract or other instrument was not the voluntary act of the maker. * * * The burden of proving such duress is on the person asserting it. [Citations.]

Mere annoyance or vexation will not constitute duress, but there must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker. [Citations.]' "

Siglinde Hale contends that the misrepresentations made by the child's paternal grandparents concerning the physical condition of her son's foot were calculated by them to deceive her into believing that her son would be crippled unless he had an operation and that by consenting to the child's adoption by them the boy would be eligible for medical payments and coverage under her father-in-law's insurance policy. In support of her assertion that the alleged deception committed by Alma and Stephen Hale in the instant cause constituted fraud and duress, Siglinde relies, in part, on the decisions in *People ex rel. Buell v. Bell*, 20 Ill. App. 2d 82, 155 N.E.2d 104 (2d Dist. 1959), and *People ex rel. Karr v. Weihe*, 30 Ill. App. 2d 361, 174 N.E.2d 897 (2d Dist. 1961).

A careful reading of these cited cases indicate they are not apposite here. In *Buell*, the consent to adoption was executed by the natural mother shortly after the child's birth while the mother was still hospitalized. At the time she executed the consent form, the mother was under the influence of sedatives and other strong drugs and had been specifically told by the doctor who delivered her child that she had six months in which to change her mind and reclaim the baby. Moreover, the natural mother in *Buell* began to take steps to get the child back on the following day and her habeas corpus petition was filed prior to any adoption proceedings. The *Buell* court upheld the lower court's finding

that the natural mother's consent was induced by false and fraudulent representations based on the time, place and other circumstances relating to the execution of the consent.

The *Karr* decision, likewise, involves dissimilar facts. In that case again the natural mother's consent to the adoption of her child was taken in the hospital shortly after she had given birth. There was uncontradicted testimony that the mother suffered from a mistaken notion that she had one year in which to get her child back. Both her husband and the administrator of the adoption agency admitted that they knowingly allowed the mother to continue with her mistaken belief. As was true in *Buell*, the natural mother in *Karr* initiated proceedings for a writ of habeas corpus to recover custody of her child prior to the institution of adoption proceedings.

■■ Moreover, the findings of duress in *Bell* and *Weihe* were largely based on several factors that were found to have contributed to or to have increased the consenting parent's susceptibility to undue influence and, as we have already noted, the factual situations involved in these cases are distinguishable from that which is involved in the case at bar. Siglinde urges that we take into consideration her age and limited experience at the time she executed the consent to adoption, factors that the *Bell* and *Weihe* courts found significant. Although we are inclined to agree that these factors are relevant in weighing the relative merits of her assertion that she was deliberately deceived into consenting to Mark's adoption, the rejection of the totality of circumstances approached by our supreme court in *Regenold v. The Baby Fold, Inc.*, dictates that we not consider these factors in determining whether fraud or duress was present in the instant cause, but that we instead focus on the alleged statements and acts of Stephen and Alma Hale.

In this regard, Siglinde asserts that her decision to consent to her child's adoption was induced by Stephen and Alma Hale's frequent warnings that the child would be crippled if he did not receive immediate medical attention. She likens her decision to that made by the natural mother in the case of *In re Sims*, 30 Ill. App. 3d 406, 332 N.E.2d 36 (4th Dist. 1975), where the court found the mother's consent to the adoption of her child was a product of duress as a matter of law. In *Sims*, the natural mother was a minor who, with her child, was living in her parents home. It was undisputed in that case that her parents had conditioned their legal obligation to support the natural mother on her consenting to the child's adoption. The *Sims* court found that the natural mother's consent to her child's adoption in light of the choice thrusted upon her by her parents, was against her free will and judgment. We cannot agree that a similar choice confronted Siglinde Hale in the instant cause so as to render her

decision to consent to Mark's adoption a product of duress as a matter of law.

■■ Even assuming *arguendo* that Siglinde was the victim of frequent warnings concerning her son's physical condition, we cannot say conclusively that such statements were fraudulent and that she was faced with no other choice but to consent to her child's adoption. It is apparent from the record that Mark had received medical care on at least two occasions in the months preceding his adoption by the Hales. On both of these occasions claims were filed with his father's medical insurer. Also, the child had a physical examination shortly before his arrival in this country. These facts alone tend to belie Siglinde's assertion that Mark's only avenue to securing medical attention was by way of her consenting to his adoption.

The factual situation involved in the case at bar is strikingly similar to that which was entailed in *In re Adoption of Hoffman*, 61 Ill. 2d 569, 338 N.E.2d 862 (1975), where the natural parents sought to vacate a decree of adoption on the grounds that the adoptive parents, who were the child's grandparents, had misrepresented to them the purpose and necessity for the adoption. In that case, as in the instant cause, there was uncontradicted evidence that the natural parents had been thoroughly admonished by the judge who accepted their consents to the adoption of their child that the consents were irrevocable and that they could not rely on any understandings they might have had with the child's grandparents concerning their parental rights following the adoption. As is true in the case at bar, there was a substantial conflict in the testimony in *Hoffman* concerning the nature and content of the discussions between the parties prior to the signing of the consents. The court concluded that the credibility of the witnesses was of major importance and found that the lower court's determination that the natural parents had failed to sustain their burden of proof was not against the manifest weight of the evidence.

■■ Applying that reasoning to the instant cause, we cannot say that the lower court's finding that Siglinde Hale had failed to meet her burden of proof on her allegations of fraud and duress was error. Our review of the facts and evidence in the record in this cause leads us to conclude that these issues could well have been resolved, as they were, in favor of Stephen and Alma Hale notwithstanding the vague, but somewhat supportive, testimony of Judge Johnson. We therefore conclude that the trial court's finding that Siglinde Hale failed to sustain her burden of proof on her allegations of fraud and duress is not against the manifest weight of the evidence.

Siglinde Hale next argues that the adoption consent form executed by

her did not substantially comply with the form prescribed in the Adoption Act and that this defect, of itself, is sufficient to void her consent.

Siglinde signed a document entitled "Consent to the Adoption of a Minor Child" which recited that she consented and agreed to the adoption of her child by Stephen and Alma Hale. The document omitted the following paragraphs from the prescribed form as set out in section 10 of the Act (Ill. Rev. Stat. 1973, ch. 4, par. 9.1—10(A)):

> "That I wish to and understand that by signing this consent I do irrevocably and permanently give up all custody and other parental rights I have to such child.
>
> That I understand such child will be placed for adoption and that I cannot under any circumstances, after signing this document, change my mind and revoke or cancel this consent or obtain and recover custody or any other rights over such child. That I have read and understand the above and I am signing it as my free and voluntary act."

The above paragraphs and the words "FINAL AND IRREVOCABLE" in the title of the document were added to the prescribed form, which was complied with in all other respects, by a 1973 amendment to the statute. In arguing that her consent to the adoption is void as a matter of law, Siglinde contends that these omissions constitute a material defect in that they go to the very purpose of the consent form, *i.e.*, notice of the permanent termination of parental rights. Relying on the decision in *In re Petition of Thompson*, 337 Ill. App. 354, 86 N.E.2d 155 (2d Dist. 1949), she argues that a consent to adoption lacking certain formal requisites deprives a court of subject matter jurisdiction over a case and thus, renders the consent invalid. In *Thompson*, the natural mother's consent to the adoption of her child had not been acknowledged by her in open court nor had her signature been witnessed by one of several designated persons as required by the adoption statute then in force. The court reversed the adoption decree that had been entered by the lower court after finding no facts in the record to support the adoptive parents' claim that the natural mother had admitted the binding force and the validity of the consent form she had signed. It should be noted that the natural mother in *Thompson* repudiated her consent to the adoption of her child one week after she had signed the consent form and prior to the hearing on the petition to adopt the child.

Stephen and Alma Hale assert that the failure of the form to fully conform with the language of section 10 of the Adoption Act does not render the consent void and relying on *McConnell v. McConnell*, 345 Ill. 70, 177 N.E. 692 (1931), argue that there was sufficient compliance with

the statute to validate the consent to adoption. In *McConnell*, an adoption proceeding was attacked because of the petition's failure to explicitly name the natural father as a party defendant, although the petition did allege that the father had abandoned the child sought to be adopted and that he had deserted it for a period of more than six months, as required by the statute. The court found that there had been sufficient compliance with the adoption statute where the record showed that the natural father had been summoned by the court as a defendant and had, in fact, appeared in open court at the time of the adoption proceedings. The *McConnell* court concluded that only substantial compliance with the adoption statute was necessary and reasoned that avoidance by the courts of strict construction of adoption statutes would benefit the public to the end that adoptions would be upheld (345 Ill. 70, 73-74, 177 N.E. 692, 695).

The question of the required conformity with section 10 of the Adoption Act was before our supreme court in the recent case of *In re Jennings*, 68 Ill. 2d 125, 368 N.E.2d 864 (1977). In *Jennings*, the natural mother had signed consents authorizing the appointment of a guardian for her children with the power to consent to their adoption pursuant to section 5—9(3) of the Juvenile Court Act (Ill. Rev. Stat. 1971, ch. 37, par. 705—9(3)). The acknowledgments of the consents attached to the documents did not fully conform to the requirements of subdivision H of section 10 of the Adoption Act in that the second paragraph of the prescribed form of acknowledgment had been omitted. The omitted paragraph contained a recital that the consenting parent had been informed of the irrevocability of her consent and that she had stated that it was her intention and desire to permanently relinquish all parental rights to the child that was to be adopted. Although the appellate court had held that the failure of the acknowledgment to conform to the form prescribed by statute invalidated the consents (32 Ill. App. 3d 857, 861-62, 336 N.E.2d 786, 790 (2d Dist. 1975)), the supreme court did not reach the issue, but instead found the consents to have been validly given in open court, a method of consent otherwise allowed under section 5—9(3) of the Juvenile Court Act. 68 Ill. 2d 125, 134, 368 N.E.2d 864, 869.

In the case at bar, the certificate of acknowledgment executed by Judge Johnson is exactly as that which is prescribed in section 10 of the adoption statute. The acknowledgment recites that Siglinde signed the consent form before him as her free and voluntary act, that he had explained to her she was irrevocably relinquishing all of her parental rights to the child and that she had stated that such was her intention and desire. Moreover, her consent to the adoption was taken in open court and the record of that proceeding shows that she was admonished about the irrevocable nature of her act prior to Judge Johnson's acceptance of her consent. The record

also shows that she was asked several questions by Judge Johnson designed to insure that she fully understood the consequences of her consent and that she answered these questions in the affirmative.

■■ Guided by the reasoning in *McConnell v. McConnell* and mindful of the strong public policy favoring the certainty and finality of adoption proceedings, we find that there has been substantial compliance with the requirements of the adoption statute in the instant cause. We reach this decision only after examining and balancing the competing interests that favor the stability and finality of adoption proceedings on one side, with the statutory safeguards afforded the unwitting consenting parent on the other. Our review of the record leads us to conclude that the irrevocable nature of her consent to Mark's adoption was sufficiently brought home to Siglinde Hale and that she understood the consequences of her act. Hence, we find that the lower court's determination that the consent to adoption form executed by Siglinde together with Judge Johnson's acknowledgement thereon substantially complied with section 10 of the Adoption Act was not error.

■■ Siglinde Hale's final contention is that the lower court's temporary refusal to allow her to confer with her attorney through her interpreter denied her rights to effective assistance of counsel and to cross-examine witnesses. Although she cites no authorities in support of her argument, her challenge is apparently based on procedural due process grounds. Procedural due process requires that every man shall have the protection of his day in court and the benefit of an orderly proceeding according to established rules and general law; and that the hearing shall not be arbitrary, but rather, shall afford to him an opportunity to be heard in his defense, and shall assure to him an inquiry on the issues of the case. (*La Salle National Bank v. International.Ltd.*, 129 Ill. App. 2d 381, 397, 263 N.E.2d 506, 1514 (2d Dist. 1970).) The lower court's temporary ruling in the instant cause came in response to the disruption caused by the three party conference at Siglinde's counsel's table during Stephen and Alma Hale's presentation of their evidence. Under these circumstances we do not perceive any violation of the concept of procedural due process.

For the foregoing reasons the order of the Circuit Court of Madison County is affirmed.

Affirmed.

JONES, J., concurs.

Mr. JUSTICE CARTER, dissenting:
I respectfully dissent.
Siglinde Hale, an 18-year-old German alien, came to Granite City,

Illinois, with her 11-month-old son on August 5, 1974. Her husband, Stephen Hale, Jr., was discharged from the service in Germany, and arrived at his parents' trailer two months later. Within two weeks after Stephen Hale, Jr.'s arrival, the question of adoption was discussed by the parents of the child and the grandparents. The mother of the child denies that she first mentioned the question of adoption while the father and grandparents dispute this.

Whether or not the child had a disability concerning his foot becomes a very important factor. There was some question at the consent hearing among the witnesses whether or not the treatment of the child's foot could be included under an insurance policy which covered the grandparents, if they legally adopted the grandchild. The transcript at the consent hearing is very revealing as to the condition of the child's foot. The attorney employed by the parents and the grandparents told the court at this hearing that: "This boy's got a crippled foot * * * foot * * * feet." The mother indicated that this wasn't true and then the father stated: "His bones * * * his heals are misplaced and he is going to go to a doctor." These answers are in direct contradiction to the testimony the natural father gave at the hearing to revoke the consent.

Judge Johnson related that at the time of the consent hearing there was some discussion by the natural parents as to their child's physical condition and the purpose of signing the consent. He also stated that Siglinde Hale spoke with a German accent and seemed to have difficulty with the English language. He concluded that Siglinde Hale looked to her husband for advice and counsel. In rebuttal, Judge Johnson testified that the natural father, at the consent hearing, concurred with the fact that the child had some problem with his foot, and also that the purpose of the proposed adoption was that the expenses of treating the foot would be covered by the adopting parents' insurance policy. Judge Johnson's impression was that when he told Siglinde that it was not necessarily so that a child could be "readopted" she became upset. Her husband then consoled her about the judge's statement and the substance of the conversation was that everything would be alright—"something would transpire later on."

I concur with the definition of fraud as expressed in *People ex rel. Chicago Bar Association v. Gilmore*, 345 Ill. 28, 46, 177 N.E. 710, and also the *Roth* case as cited in the majority opinion. This instant case in my opinion comes within the definition of fraud as expressed above. Siglinde Hale was in this country approximately 125 days when she appeared in court to sign the consent for adoption, and also an entry of appearance. The explanation as to the meaning of the entry of appearance to Siglinde Hale by the judge should not be overlooked. A complete understanding of this step in the legal proceeding to an average person born and

educated in this country and not having been exposed to any legal proceedings whatsoever would be inconceivable. I feel sure this person would ask one or two questions concerning the entry of appearance unless a misrepresentation had been made in advance, or the person was under duress.

Within two weeks after Stephen Hale, Jr., joined his family, he advised his wife to consult an attorney about the proposed adoption. This problem was discussed frequently among the natural parents and the grandparents until the consent was signed. Of all the witnesses who testified for the adoptive parents, there wasn't one who spoke or understood the German language, but most of them indicated Siglinde understood the English language. There wasn't any attempt on the part of the Hale family to fully acquaint Siglinde with the total effect of her actions by an impartial and independent counselor or adviser. We are not confronted with a young mother in her own country, speaking her own language and in contact with her own family. If this were the case, I could easily agree with the majority.

I believe that the lower court's finding that Siglinde Hale had failed to meet her burden of proof on her allegations of fraud and duress was error, and the lower court's finding should be reversed.