REXALL CLEO PARKS *et al.*, Plaintiffs-Appellees, v. MARY ANN McWHORTER, Defendant-Appellant (Glenn Farris McWhorter, III, *et al.*, Defendants).

Fifth District    No. 5—84—0090

Opinion filed June 10, 1986.

Michael F. Dahlen, of Feirich, Schoen, Mager, Green & Associates, of Carbondale, for appellant.

Krystal S. Tison, of Harrisburg, for appellee Rexall Cleo Parks.

Norma Miner, of Marion, guardian *ad litem*.

JUSTICE JONES delivered the opinion of the court:

Defendant Mary Ann McWhorter appeals from the trial court's denial of her motion to set aside an interim adoption order terminating her parental rights to her son, here referred to as Baby Glenn. Both Mary Ann McWhorter and her husband, Glenn Farris McWhorter, Jr., the baby's father, had relinquished their rights to the child in a consent for adoption signed by them in Duval County, Florida. Mrs. McWhorter subsequently sought to revoke her consent by motion challenging the validity of this consent. On appeal from denial of her motion, Mrs. McWhorter contends that the consent for adoption was invalid because it had been improperly executed under Florida and Illinois law and had been entered into by her as a result of fraud and duress. She additionally contends that the trial court erred in finding that she was competent to understand the import of her actions and

that, as an indigent parent, she should have been afforded a free transcript and common law record for purposes of this appeal. We affirm.

Mary Ann McWhorter and Glenn Farris McWhorter, Jr., were married on February 4, 1980. Three children were born of their marriage, including Baby Glenn who was born on October 28, 1982. The other two children were born on October 17, 1980, and December 6, 1981.

The McWhorters lived in Florida, where Mr. McWhorter was stationed in the Navy. Mrs. McWhorter testified that after the first child was born, the couple began to have disagreements over how money should be spent. On one occasion there was not enough money to buy milk for the child. Mrs. McWhorter stated that her husband had beaten her approximately four times over the course of the marriage and that the couple had separated at least four times between February 1980 and December 1983. During each of these separations, Mrs. McWhorter took her children and went to live with her parents in southern Illinois.

Mrs. McWhorter testified that while she was pregnant with Baby Glenn, her husband had told her to "get an abortion." After Baby Glenn was born, Mr. McWhorter threatened to leave her in Florida with the children and only $250 a month in income.

Mrs. McWhorter began to consider putting the baby up for adoption since she would be able to get away from her husband more easily with only her two older children. She knew that her mother would come to get her if she called and that she could return to her parents' home with the children and her parents would help her. She thought about taking the baby to an agency and leaving him there. In March or April 1983 Mrs. McWhorter contacted Jackie Filer, a minister's wife she had met in southern Illinois while staying with her parents, and asked Mrs. Filer if she would adopt Baby Glenn. Mrs. Filer discussed the adoption with Mary Ann McWhorter on at least four occasions and advised her that she and her husband would be giving up their rights to the baby if they put him up for adoption. Mrs. Filer additionally discussed alternatives to adoption with Mary Ann McWhorter, suggesting that she call her mother or that she seek help or counseling there in Florida.

Prior to a final decision by the Filers about adopting the baby, Mary Ann McWhorter's parents came to Florida and stayed with her for two weeks. During this two-week period Mary Ann McWhorter did not discuss her plans for the adoption with her parents. Her mother repeatedly asked Mary Ann McWhorter to return with them to Illinois, but she had decided to stay in Florida and "go out on her

own." Mary Ann McWhorter testified that she believed her parents would have taken her and the children back with them or would have taken the baby if she had asked them to do so.

Later in April 1983 Jackie Filer notified Mary Ann McWhorter that she and her husband would not adopt the baby. She told Mary Ann McWhorter, however, that she knew another couple that might want to adopt the baby and gave her the telephone number of the plaintiffs, Rexall and Eugenia Parks. Following telephone calls between the Parkses and the McWhorters, arrangements were eventually made for the adoption of Baby Glenn by the Parkses.

While Mr. McWhorter originally was opposed to the idea of putting the baby up for adoption, he later reconsidered and decided that it would be the best thing for the child. The Parkses had retained an Illinois attorney, Krystal Tison, to represent them, and after speaking with Ms. Tison by telephone, the McWhorters met with an attorney in Jacksonville, Florida, to discuss the adoption. This attorney declined to represent them, and arrangements were made through the Parkses and Ms. Tison for another Florida attorney, Jack Harris, to prepare the adoption consent papers.

On May 6, 1983, the McWhorters met in attorney Jack Harris' office to sign the adoption papers and leave Baby Glenn to be picked up by the Parkses. Both the McWhorters and the Parkses signed individual consents, which were witnessed by attorney Harris and a neighboring attorney's secretary, Joanne Wells, and notarized by attorney Harris' secretary, Sharon Eve Bloodworth. The parties additionally signed a disclaimer stating that all parties were residents of Illinois and that the adoption, if one were to result, would be accomplished according to Illinois law. After signing the adoption consents, the McWhorters left Baby Glenn, along with his clothes, bottle, and toys, at the attorney's office.

Mary Ann McWhorter testified that as she and her husband were leaving the attorney's office after signing the adoption consents, Mr. Harris told her that she had "30 days to change her mind." Both her husband and attorney Harris denied that such a statement was ever made. Although at one point in her testimony Mary Ann McWhorter stated that she did not believe the two witnesses and the notary public were all present in the room when she signed her consent, at other times in her testimony she stated that she did not know who was present when she signed the document. The two witnesses and the notary public testified that they were all three present when Mary Ann McWhorter signed her consent.

When Mary Ann McWhorter's mother called the following day,

she told her about the adoption, and her mother objected strongly. Approximately a week after signing the consent for adoption, Mrs. McWhorter took her other two children and went to live with her parents in Illinois.

The plaintiffs subsequently filed a petition for adoption in the circuit court of Williamson County, Illinois, and, on May 25, 1983, the court entered an order finding that the McWhorters had consented to adoption of their son by the plaintiffs and terminating their parental rights. The court awarded temporary custody of Baby Glenn to the plaintiffs, appointed a guardian *ad litem*, and ordered an investigation of the adoption as required by statute (see Ill. Rev. Stat. 1985, ch. 40, par. 1508). On June 24, 1983, Mary Ann McWhorter filed a motion to set aside the interim adoption order. Subsequently, Mrs. McWhorter's counsel moved to withdraw from the case, and she sought and obtained leave to sue as a poor person with court-appointed counsel.

Following a hearing the court, on January 18, 1984, issued a memorandum decision denying Mary Ann McWhorter's motion to set aside the interim adoption order. The court found that the evidence failed to show that Mrs. McWhorter did not understand or appreciate the significance of signing the consent for adoption or that her signing was the result of any legal duress or fraud. The court additionally found that there was no basis for her claim that she believed her consent was revocable.

Mary Ann McWhorter filed an interlocutory appeal from this order, and the appellate court dismissed the appeal for lack of jurisdiction. Prior to dismissing the appeal, however, the appellate court entered an order that Mary Ann McWhorter's motion to waive costs and expenses on appeal and for preparation of a free report of proceedings and record on appeal be granted only to the extent of waiving the filing fee in the appellate court. On appeal to the supreme court, the order of dismissal was vacated, and the cause was remanded to the appellate court for hearing on the merits. *Parks v. McWhorter* (1985), 106 Ill. 2d 181, 478 N.E.2d 324.

■ In this appeal Mary Ann McWhorter contends that the consent for adoption signed by her was improperly executed because one of the witnesses to its execution was an attorney retained by a party to the proceeding and the other witness and the notary public were that attorney's employees. She additionally contends that the evidence failed to show that she and her husband signed the consents in the presence of the witnesses and notary public as required by Florida and Illinois law.

The Illinois provision governing execution of adoption consents

states in pertinent part:

"A surrender or consent executed and acknowledged outside of this State, either in accordance with the law of this State or in accordance with the law of the place where executed, is valid." (Ill. Rev. Stat. 1985, ch. 40, par. 1512(L).)

Florida law provides that the consent shall be executed:

"only after the birth of the child, in the presence of two witnesses, and be acknowledged before a notary public." Fla. Stat. sec. 63.082(4) (1985).

The Florida statute governing the execution of adoption consents places no restrictions on who may witness or notarize an adoption consent, and neither Florida nor Illinois case law requires that a document be invalidated where witnessed by an attorney in such a proceeding. While the practice by an attorney in a legal proceeding of taking affidavits to be used in the proceeding or acknowledging a client's affidavit has been disapproved by courts in both States (*People ex rel. Burt v. City of Springfield* (1927), 328 Ill. 172, 159 N.E. 248; *Savage v. Parker* (1907), 53 Fla. 1002, 43 So. 507), this practice "has never been held to invalidate the affidavit or work reversible error in a lawsuit" (*People ex rel. Burt v. City of Springfield*, 328 Ill. 172, 175, 159 N.E. 248, 249; *Savage v. Parker* (1907), 53 Fla. 1002, 43 So. 507).

The reason for the courts' disapproval of attorneys taking affidavits or administering oaths to be used on behalf of their clients in legal proceedings is that such attorneys are interested in the proceedings and presumably biased in favor of the clients whom they represent. (*Peck v. People ex rel. Kern* (1897), 153 Ill. 454, 39 N.E. 117; 1 Ill. L. & Prac. *Affidavits* sec. 4, at 650 (1953).) It is axiomatic that oaths and affidavits should be taken before officers that are disinterested or unbiased. (*Peck v. People ex rel. Kern* (1897), 153 Ill. 454, 39 N.E. 117.) In the instant case, however, it does not appear that attorney Jack Harris was involved in the adoption proceeding in such a way as to give rise to prejudice or bias towards any party. The Parkses had already retained an Illinois attorney to represent them in the adoption proceeding, and Mr. Harris was contacted solely for the purpose of preparing the necessary consent forms. He was not retained to be their representative in court, and it was not contemplated that he would do anything more than prepare the adoption consents and insure that the signing was handled properly.

While, as the defendant points out, the Parkses paid attorney Harris for his services in preparing the consent forms, such payment did not result in formation of an attorney-client relationship where

Mr. Harris offered no counsel to either party and was not otherwise involved in the adoption proceeding. As Mr. Harris stated in his evidence deposition, he "[did not] feel that [he] was really in charge of [the] situation [but was] trying to do what the parties wanted done." It was his impression that "a decision *** had been reached without my participation and that both sets of parents *** felt that they needed a document to effectuate it. I merely supplied that."

Mr. Harris had no further role in the adoption proceeding. He did not enter an appearance or receive notice of the hearings, and the attorneys of record did not serve him with copies of the pleadings. The situation at bar is thus distinguishable from that in cases cited by the defendant in which the attorneys involved were attorneys of record who were actually employed to represent the plaintiff or defendant and who had charge of the proceedings. (See *Phillips v. Phillips* (1900), 185 Ill. 629, 57 N.E. 796; *Linck v. City of Litchfield* (1892), 14 Ill. 469, 31 N.E. 123.) The services performed by attorney Harris were not of such a nature as would tend to bias him in favor of or against any party, and there was, therefore, no reason for disqualifying him as witness. (*Cf. Peck v. People ex rel. Kern* (1897), 153 Ill. 454, 39 N.E. 117.) (reasons rendering it improper for attorney to take affidavit for use in legal proceeding in which he is professionally engaged were absent where there was nothing in commissioner's position or duties which would have tendency to make him biased toward either party).) Since attorney Harris properly witnessed execution of the adoption consents, the actions of his employees in witnessing and notarizing the consents were also proper, and the defendant's consent cannot be said to be invalid on this basis.

■■ While the defendant additionally contends that the consents were not executed in the presence of the witnesses and notary public, the record fails to support this contention. Despite Mary Ann McWhorter's initial testimony that the witnesses and notary public were not all present in the room when she signed her consent, she later admitted that she did not know who was present at the time. Her husband's testimony was similarly inconclusive, as he could not recall whether the two witnesses and notary public were all in the room at the time of signing the adoption consents. Jack Harris, the Florida attorney who witnessed the adoption consents, stated that the consents were signed in his presence and in the presence of the other witness, Joanne Wells, as well as his secretary, Sharon Eve Bloodworth, the notary public before whom the signatures were acknowledged. Similar testimony was given by Ms. Wells and Ms. Bloodworth. In light of this positive testimony and the lack of con-

trary evidence, the trial court correctly found that the adoption consents were properly executed pursuant to the Florida statute so as to be valid in Illinois.

■■ ■ From a review of the record we find no merit in the defendant's further contention that her consent for adoption was entered into as a result of duress or fraud and so should be set aside. Florida law allows for a consideration of physical and psychological stress in determining if there has been sufficient duress to invalidate an adoption consent. (25 Fla. Jur. 2d *Family Law* sec. 157 (1981); see Fla. Stat. sec. 63.082(5) (1985).) While the evidence here showed that Mary Ann McWhorter was under stress due to marital difficulties with her husband, there were options available to her other than giving her child up for adoption, and it appeared that she made this decision on her own without duress from others. The evidence showed that she initiated the idea of adoption and had to talk her husband into it and that she had had the option of taking the children to live with her parents if she had chosen to do so. Indeed, her parents had come to stay with her in Florida for two weeks after she had first approached Jackie Filer about adopting her son, and Mary Ann McWhorter had said nothing to them about the adoption and had refused her parents' repeated requests that she and the children return with them to Illinois. Despite her claim, moreover, that her husband had insisted on going through with the adoption when she later became hesitant, Mary Ann McWhorter demonstrated no outward reservation or objection at the time of executing her consent. (*Cf. Grabovetz v. Sachs* (Fla. App. 1972), 262 So. 2d 703 (court emphasized lack of outward reservation by biological mother upon executing her consent in finding that consent was freely and voluntarily given).) For these reasons, we agree with the trial court's finding that there was insufficient evidence of duress to invalidate the defendant's consent.

We likewise find no merit in the defendant's contention that her consent was tainted by fraud due to misrepresentations made in the disclaimer signed by the parties and due to attorney Harris' alleged representation to the defendant that she had 30 days to revoke her consent. The record indicates that the McWhorters were the source of information in the disclaimer regarding their residence in Illinois, and, while Mr. McWhorter's residence was subject to some uncertainty because he was in the Navy, any inaccuracy as to his residence was not a material misrepresentation made to induce Mary Ann McWhorter to sign the consent so as to vitiate her consent for fraud. For a misrepresentation to constitute fraud, "it must be a false statement of material fact intentionally made to induce another party to act in reliance

on the truth of the statement." (*Hale v. Hale* (1978), 57 Ill. App. 3d 730, 737, 373 N.E.3d 431, 436.) Likewise, attorney Harris' alleged representation to Mary Ann McWhorter that she had 30 days to revoke her consent, if actually made, would not constitute fraud because, by her own testimony, it came after the consents had been signed and thus did not induce her to sign the adoption consent. In any event, both attorney Harris and the defendant's husband, who was in the room, testified that such a statement was never made, and the defendant's behavior fails to support her contention since she did not act to revoke her consent within 30 days. The trial court's finding of no fraud in the execution of the defendant's consent, therefore, was consistent with the evidence and must be affirmed.

■ Finally, we agree with the trial court's finding that Mary Ann McWhorter was competent to understand the import of her actions at the time she signed the adoption consent. Dr. Everett Davis, a clinical psychologist called on behalf of the defendant, stated that test results regarding the defendant's intelligence and emotional health were inconclusive and that he was unable to make a definitive statement concerning the defendant's ability to appreciate and comprehend the significance of signing the adoption consent. He testified, however, that her overall intellectual functioning was in the normal range and that he had found no pathology or emotional disturbance. It is axiomatic that one is presumed competent until the contrary is shown. (*People ex rel. Drury v. Catholic Home Bureau* (1966), 34 Ill. 2d 84, 213 N.E.2d 507.) In the absence of evidence to the contrary, the trial court's finding here that the defendant was able to understand the consequences of her actions was not against the weight of the evidence and must be affirmed.

While the defendant additionally contends that she should have been afforded a free transcript and record on appeal, this court has previously denied such a request in the instant cause, and we find no basis under statute or case law for altering this ruling. For the reasons stated in this opinion we affirm the decision of the circuit court of Williamson County in favor of the plaintiffs.

Affirmed.

KASSERMAN, P.J., and KARNS, J., concur.